**James A. BERRY, et al., Plaintiffs,**

v.

**GENERAL MOTORS CORPORATION, Defendant.**

Civ. A. No. 88–2570–L.

United States District Court, D. Kansas.

June 17, 1992.

Dennis E. Egan, The Popham Law Firm, Kansas City, Mo., Christopher Iliff, Stillwell, Kan., Michael K. Whitehead, Kansas City, Mo., for plaintiffs.

Stephen A. Murphy, Michael J. Grady, Gage & Tucker, Overland Park, Kan., John J. Yates, Paul Scott Kelly, Jr., Marietta Parker, Rosalee M. McNamara, Gage & Tucker, Kansas City, Mo., for defendant.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

In this employment discrimination action, fifteen plaintiffs have sued General Motors Corporation (GM) alleging various theories of recovery, including race discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2 *et seq.*, and under 42 U.S.C. § 1981; sex discrimination under Title VII; age discrimination under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 623 and 626(c); and breach of an implied contract of employment.[1] Defendant GM has moved for summary judgment on the implied contract claims (Doc. # 82), and on the discrimination claims (Doc. # 97, 99, 101, 103, 105, 107, 109).

Plaintiffs claim that GM breached its implied contract and discriminated against them when GM shut down its Fairfax plant in Kansas City, Kansas. All fifteen plaintiffs were salaried employees at the Fairfax plant until May of 1987. In response

---

1. This court has what was then called "pendent" as well as diversity jurisdiction over the implied contract claims. 28 U.S.C. § 1332. Because the implied contract was allegedly formed in Kansas, that state's laws govern its interpretation. See *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941) (Kansas choice of law rules determine applicable substantive law); *Simms v. Metropolitan Life Ins. Co.*, 9 Kan.App.2d 640, 642, 685 P.2d 321 (1984) (law of state in which contract was made is applied to determine disputes concerning the contract).

to increased competition from Japanese auto manufacturers and other market forces, GM decided to close its Fairfax plant and open a new, more automated plant, referred to as the "GM–10" facility. The manner that employees were selected to staff the new plant is the subject of this lawsuit.

After extensive briefing and oral argument on GM's motions for summary judgment, the court is now prepared to rule. For the reasons set forth more fully below, GM's motion for summary judgment on the implied contract claims is denied, and its motions for summary judgment on the discrimination claims are granted in part and denied in part. In addition, GM's motion for separate trials (Doc. # 148) is denied.

When considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the nonmoving party. *Barber v. General Elec. Co.*, 648 F.2d 1272, 1276 n. 1 (10th Cir. 1981). If the moving party does not bear the burden of proof at trial, it must show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

Once the movant meets these requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). The nonmovant may not merely rest on the pleadings to meet this burden. *Id.* Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. at 2511; *Tersiner v. Union Pacific R.R.*, 740 F.Supp. 1519, 1522–23 (D.Kan.1990). More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" Fed. R.Civ.P. 1." *Celotex*, 477 U.S. at 327, 106 S.Ct. at 2555.

## I. FACTS

In its memoranda supporting its motions for summary judgment, GM has set forth statements of material facts that it offers as uncontroverted. D.Kan.Rule 206(c). The asserted uncontroverted facts are properly supported by references to deposition testimony and other admissible evidence. Fed.R.Civ.P. 56(c). The following facts do not appear to be controverted for purposes of these motions.

Seven of the plaintiffs assert claims of discrimination in violation of federal law in addition to the pendent state law contract claims. Plaintiff James Berry is an African-American male who was forty-one years old in May of 1987 when the downsizing of GM's Fairfax plant and transfers to the GM–10 plant occurred. He was a salaried sixth level production supervisor in the body shop prior to the 1987 work force changes. Mr. Berry was not selected to be a supervisor in the body shop in the new GM–10 plant. GM offered Mr. Berry what it referred to as the Special Separation Incentive Program (SSIP)—which consisted of a lump sum payment, continuation of certain insurance benefits, and career counseling—in exchange for his voluntary separation from employment. Mr. Berry, who had previously worked as an hourly employee in GM's bargaining unit before becoming a salaried employee, declined to accept the SSIP and elected to return to the hourly rolls. Mr. Berry claims that the selection process used by GM to choose salaried employees to staff the GM–10 facility was discriminatory. He asserts claims of race discrimination and retaliation under Title VII and section 1981 and age discrimination under the ADEA.

Plaintiff Consolacion DiDonna is a female native of the Philippines. She was a salaried fourth level time keeper in the financial department prior to the downsizing and transfers in May 1987. She was not chosen to staff this position at the new plant, however. Like plaintiff Berry, she was offered and declined the SSIP. From October 1987 to March 1988 Ms. DiDonna was assigned to a salaried position in the suggestions section, retaining her fourth

level salary status. She was then laid off in connection with a volume reduction in 1988. Ms. DiDonna asserts claims of national origin discrimination and retaliation under Title VII and section 1981.

Plaintiff Eugene Gold is an African-American male who was forty-four years old in May of 1987. He was a salaried sixth level production supervisor in the hard trim department prior to the 1987 downsizing and transfers. He also was not chosen for this position at the new plant, and he also was offered and declined the SSIP. Like Mr. Berry, Mr. Gold opted to return to the hourly rolls. He asserts claims of race discrimination and retaliation under Title VII and section 1981 and age discrimination under the ADEA.

Richard McCauley is a white male who was forty years of age when the 1987 work force changes occurred. He was a salaried fifth level material scheduler in the material department in May of 1987. He was offered and declined the SSIP and elected to return to the hourly rolls. Mr. McCauley brings claims of retaliation under Title VII and age discrimination under the ADEA.

Plaintiff Linda Howell is a white female who was forty-one years old in May of 1987. She was a salaried fifth level specialized clerk in the personnel department prior to the downsizing and transfers. She also declined to accept the SSIP. From May 1987 to March 1988 Ms. Howell was assigned to salaried positions in the security and financial departments, retaining her fifth level salary status. She was laid off in August of 1988 in connection with a volume reduction. She asserts claims of sex discrimination and retaliation under Title VII and age discrimination under the ADEA.

Plaintiff Bernard Hurt is a white male who was forty-two years old when the work force changes at issue occurred. He was a salaried fifth level associate reliability engineer in the quality control/reliability departments in 1987. He was offered and declined the SSIP and elected to return to the hourly rolls. He brings claims of retal-

iation under Title VII and age discrimination under the ADEA.

Harold Scott is an African American male who was a salaried fifth level material scheduler in the materials department prior to the downsizing in 1987. He also was offered and declined the SSIP and instead elected to return to the hourly rolls. He asserts claims of race discrimination and retaliation under Title VII and section 1981.

All of the plaintiffs contend that GM published and distributed a personnel policy manual entitled "Working With General Motors" (employment manual). They maintain that this employment manual, as confirmed by past practice and oral representations by GM supervisors, created an implied employment contract. Portions of this employment manual establish procedures that GM management has pledged to follow when making employment decisions relating to qualifying salaried employees. Plaintiffs claim that GM breached this implied contract by disregarding these procedures when it made decisions regarding which salaried employees at the old Fairfax plant would be offered positions at the new GM–10 plant.

Instead of following the procedures outlined in the employment manual, which allegedly protect the jobs of employees with the most years of service at GM, plaintiffs assert that GM's plant manager, Gus Bierne, instructed his department heads to ignore formal procedures and to choose whomever they wanted to staff their departments at the GM–10 plant. Salaried employees who were not selected to staff the new plant allegedly were given several options: plaintiffs claim that they were told they must either accept a buy out agreement and leave GM, return to the hourly rolls, or be fired; defendant maintains that employees were offered the buy out, a return to the hourly rolls, or a different salaried job at GM.

Of the fifteen plaintiffs, nine voluntarily transferred to the hourly rolls, four were given different salaried positions, and two others were initially given different salaried jobs and eventually laid off. The

plaintiffs who opted to return to the hourly wage status argue that they were coerced into taking this option. All of the plaintiffs allege that GM breached the implied contract contained in the employment manual by not choosing them to staff the new plant.

## II. IMPLIED CONTRACT CLAIMS

The plaintiffs claim that several portions of the employee manual establish the terms of the implied contract. The operative portions are set forth at pages 25–27 of the manual:

> Salaried employes [sic] with one year of service whose performance is consistent with GM's standards will not be laid off due to outsourcing, productivity improvements and new technology. Layoffs may occur as a result of declines in volume of business, shifts in market preferences or reorganizations....

> In the event that outsourcing, productivity improvements or introduction of new technology result in the need for fewer salaried employes, units will first attempt to achieve the necessary reductions through the separation of non-regular employes. If salaried manpower is still in excess of unit needs, redundant regular salaried employes will be identified through the existing reduction-in-force policy. However, those employes will not be laid off but will be placed in transitional status.

> "Transitional employes" may participate in training, function as a trainer, replace another employe for training, or function in a temporary assignment....

> Although GM cannot always guarantee the same job in the same classification, level or location, the Corporation will do its best to find jobs which recognize the skills, abilities and experience of employes on layoff or in transitional status.

> ....

> Reduction in Force Procedures

> If layoffs become unavoidable, reductions in the work force are made separately by each department and job classification.... Reductions will be made generally in the order of least total Corporate length of service for employes with five or more years of length of service and with a performance rating of Good Competent or higher.

Plaintiffs allege that GM breached this implied contract in nine different ways, set forth in the Pretrial Order. These violations allegedly occurred during the transition to the new GM–10 plant in 1987.

The defendant admits for the purposes of this motion that the employee manual "Working With General Motors" creates an implied contract of employment.[2] GM makes two arguments in its motion for summary judgment on this cause of action: 1) the contract terms implied from the employee manual did not apply to these plaintiffs; and 2) even if the contract did apply, it was not breached. The first argument merits the most attention.

### A. Did the Contract Apply?

GM claims that the alleged contractual procedures did not apply in this case for several reasons: no "layoffs" occurred in this work force reduction, and the contract applies only when there are layoffs; many plaintiffs voluntarily opted to return to the hourly rolls, so the employment manual, which applies only to salaried staff, was inapplicable to those plaintiffs; and finally, the action taken by GM was an unprecedented, voluntary "downsizing" of its work force, not a "reduction in force" to which the manual was meant to apply.

Plaintiffs claim that the implied contract did apply, and that the contract was breached because GM did not use the procedures outlined in the employee manual to determine who would be offered jobs in the new plant. Instead, plaintiffs maintain that the plant foreman at GM allowed his department heads to choose whomever they wanted to staff the new plant, without taking into consideration length of service or performance evaluations. According to

---

**2.** Under Kansas law, which governs the breach of implied contract claims, whether an implied contract of employment exists is a question of fact. *Brown v. United Methodist Homes for the Aged,* 249 Kan. 124, 133, 815 P.2d 72 (1991).

plaintiffs, plant manager Gus Bierne told department heads to "keep who you want, staff your new departments as you want to." (Exh. D to Plaintiffs' Memorandum Opposing Summary Judgment, Schmer depo. at 105). Under plaintiffs' reading of the contract, any reduction in the size of the work force should have been accomplished using the procedures outlined in the employee manual. Plaintiffs also contend that they were essentially "laid off" by the manner in which they were treated, thus triggering the operation of the contractual protections.

The Kansas Supreme Court has recognized that the employment-at-will doctrine has been eroded by recent trends in the law. *Morriss v. Coleman Co.,* 241 Kan. 501, 738 P.2d 841 (1987). Courts now tend "to interpret employment contracts more broadly and to recognize an implied obligation on the part of the employer not to terminate an employee arbitrarily where a policy or program of the employer, either express or implied, restricts the employer's right of termination at will." *Id.* at 509, 738 P.2d 841; *see also Pegg v. General Motors Corp.,* 785 F.Supp. 901 (D.Kan. 1992). The Kansas Court of Appeals has adopted the following general guideline:

> Where it is alleged that an employment contract is one to be based upon the theory of "implied in fact," the understanding and intent of the parties is to be ascertained from several factors which include written or oral negotiations, the conduct of the parties from the commencement of the employment relationship, the usages of the business, the situation and objective of the parties giving rise to the relationship, the nature of the employment, and any other circumstances surrounding the employment relationship which would tend to explain or make clear the intention of the parties at the time said employment commenced.

*Allegri v. Providence–St. Margaret Health Center,* 9 Kan.App.2d 659, Syl. ¶ 5, 684 P.2d 1031 (1984); *accord Brown v. United Methodist Homes for the Aged,* 249 Kan. 124, 133, 815 P.2d 72 (1991); *Morriss,* 241 Kan. at 513, 738 P.2d 841 (citing and applying the *Allegri* rule).

After examining the voluminous record in this case, the court concludes that genuine issues of material fact remain for trial on the issue of the applicability of the alleged implied contract. Initially, plaintiffs raise genuine issues of fact regarding whether there were any layoffs in the 1987 "downsizing" of GM's work force. The term "layoff" appears to have no uniformly accepted meaning. The employment manual does not define the term and the parties espouse different definitions. GM argues that a layoff occurs when a position is temporarily eliminated. It suggests that the reductions in 1987 were permanent and therefore not "layoffs." Black's Law Dictionary, however, defines the term to include both temporary and permanent suspensions of employment. *See* Black's Law Dictionary 799 (5th ed. 1979) ("A termination of employment at the will of the employer. Such may be temporary ... or permanent."). The definition offered by the Kansas Supreme Court is also inconclusive. "A 'layoff' is looked on as at least a suspension of employment, and in some instances as termination thereof, at the will of the employer without prejudice to the worker being reemployed.... Certainly it implies no element of voluntariness on the part of the employee." *Goodyear Tire & Rubber Co. v. Employment Security Board of Review,* 205 Kan. 279, 285, 469 P.2d 263 (1970).

Plaintiffs contend, on the other hand, that the term has a flexible meaning, dependent upon the intent of the parties to the particular contract. *See Moore v. Jones,* 215 F.2d 719 (10th Cir.1954) (when the meaning of a term in a contract is uncertain, the court may consider the construction that the parties placed upon the term); *Northern Natural Gas Co. v. Grounds,* 292 F.Supp. 619, 668 (D.Kan. 1968), *aff'd in part and rev'd in part,* 441 F.2d 704 (10th Cir.), *cert. denied,* 404 U.S. 951, 92 S.Ct. 268, 30 L.Ed.2d 267 (1971). Plaintiffs note that GM's own personnel administrator has indicated that he believes that a layoff includes placing salaried employees back on the hourly rolls. (*See* Schmer depo. at 102). Under this defini-

tion, several of the plaintiffs were "laid off" in the 1987 downsizing.

Plaintiffs also note that plant manager Gus Bierne indicated to other individuals in supervisory positions that layoffs would be inevitable in the 1987 downsizing. Finally, GM's personnel records [3] indicate that the plaintiffs who opted to return to the hourly rolls were temporarily "laid off" for up to five months just days after they went back to hourly because they did not have sufficient seniority to hold hourly positions at that time.[4]

Of more importance to the court's determination that summary judgment is inappropriate on the breach of contract claim is the fact that the employment manual can be read to require the use of GM's reduction in force policies even absent any layoffs. The section of the employment manual titled "Reduction in Force Procedures" provides that "[i]f layoffs become unavoidable, reductions in the work force are made separately by each department and job classification.... Reductions will be made generally in the order of least total Corporate length of service...." GM contends that, for these "length of service" rules to apply, there first must be layoffs. However, the employment manual also invokes the reduction in force procedures if "the introduction of new technology result[s] in the need for fewer salaried employes." In such a circumstance, the reduction in force procedures are used to identify "redundant regular salaried employes." "However, those employes *will not be laid off* but will be placed in transitional status." (emphasis added). Thus, the reduction in force

procedures may be utilized even if no layoffs are contemplated. Whether the introduction of new technology caused the need for fewer salaried GM employees is a question of fact that the court cannot resolve on a motion for summary judgment.

Moreover, other portions of the employment manual arguably imply that the length of service rules should have applied to the staffing decisions at GM–10. For example, page three of the manual states: "General Motors has a well-defined selection process which is in operation at every GM location to make decisions regarding hiring, promotions, *transfers, and other forms of movement.*" (emphasis added). The manual also assures employees that "your personnel Department reviews all proposed changes to ensure that they are consistent with GM salaried personnel policies and procedures." *Id.*

■ At the very least this language creates an ambiguity concerning the scope of the protection afforded to salaried employees by the manual. The initial determination regarding whether a contract is ambiguous is one of law. *C.F. Braun & Co. v. Oklahoma Gas & Elec. Co.*, 603 F.2d 132, 133 (10th Cir.1979). When a contract is ambiguous, however, its interpretation becomes a question of fact dependent upon competent evidence concerning the intention of the employer and the beneficiaries, such as past interpretations, past practices, and customary usage. *Taylor v. Continental Group*, 933 F.2d 1227, 1232 (3d Cir.1991); *Gomez v. American Elec. Power Serv. Corp.*, 726 F.2d 649, 651 (10th Cir.1984).[5] Because the language of the

**3.** These personnel records were provided by plaintiffs in their Motion to Supplement the Record (Doc. # 166), which defendant GM opposed. Because the court considers the material submitted in plaintiffs' motion to be relevant to the motions for summary judgment, plaintiffs' motion to supplement is granted. The court does not find it necessary, however, to allow GM an opportunity to further brief the issues raised in that motion.

**4.** The court recognizes that these layoffs came after the initial decisions were made regarding who would be chosen to staff the new GM–10 plant. Nevertheless, reading the facts in the light most favorable to the plaintiffs, a reason-

able jury could conclude that the subsequent layoffs of those plaintiffs who returned to the hourly rolls occurred as a result of GM's staffing decisions at the new plant.

**5.** Plaintiffs contend that the implied contract at issue was based on oral representations by GM management and past practices at GM, as well as the employment manual. In response to GM's motion for summary judgment, plaintiffs have come forward with deposition testimony indicating that GM employees were told that the reduction in the salaried work force in 1987 would be accomplished through retirement and normal attrition. In addition, plaintiffs cite deposition testimony of GM officials which indi-

employment manual in this case is unclear, its interpretation should be left to the trier of fact.

Finally, GM contends that the work force modifications that took place when the new plant was opened were unprecedented in its history, so the employee manual could not have been intended to apply. GM draws a distinction between the "reductions in force" that occurred during past changes in the company, and the voluntary "downsizing" that occurred in this case. According to GM, in a "downsizing" no layoffs are contemplated or utilized, whereas layoffs are common in the traditional "reduction in force." Plaintiffs respond that this distinction is merely a semantic one, invented by the defendant to circumvent the strictures of its own policy manual. Although it is unclear at this point whether there is a distinction between these terms, it appears to be uncontroverted that in this case there was a "need for fewer salaried employes," which could have triggered the protections afforded in the contract whether there was a "downsizing" or "reduction in force." Therefore, the court cannot hold as a matter of law that the alleged contract at issue did not apply to the work force reduction in 1987.

The court notes, in passing, that GM's argument has some appeal as a *policy* matter in light of changing economic times and arguably increased need for competitiveness on an international playing field. However, a district court does not make policy in this area or change the rules of the game. That is left to the legislature or to the higher courts. Thus the court here remains bound by its analysis of what the law of Kansas is and was as of the date of the events in question.

### B. Was the Contract Breached?

■ GM argues that, even if the alleged implied contract applied, it was not breached by GM's actions with respect to any of the plaintiffs. According to GM, none of the plaintiffs was laid off in connection with the 1987 downsizing and none was denied the opportunity to remain as a regular salaried employee at their home unit.[6]

Plaintiffs contend, however, that the reduction in force procedures should have been used to determine which employees would be chosen to work in the new GM–10 plant and which ones would be presented with the other options. By allowing department heads to "choose who they wanted" to staff the new plant without regard to length of service, plaintiffs contend that GM breached the implied contract. In addition, plaintiffs argue that they were laid off as a result of the decisions made by GM.

In light of the analysis in the preceding section, the court concludes that triable issues of material fact remain regarding the meaning of the term "layoff" and the circumstances under which GM was required by the employment manual to use length of service considerations in staffing decisions. If the trier of fact determines that there was an implied contract and that it required GM to consider length of service when making transfer decisions (issues that the court believes are fact-driven and unresolved), then GM may have breached that contract by not using length of service as a criteria for choosing who would staff the new plant.

■ GM also asserts that some of the plaintiffs "voluntarily" opted to return to the hourly payroll, so the rights and procedures set forth in the employee manual no longer applied to them. The plaintiffs vig-

cates that the reduction in force procedures "were used" in the 1987 downsizing. Despite the ambiguity in the cited deposition excerpts, this evidence, together with the language in the employment manual, creates a triable issue regarding the applicability of the alleged employment contract to the 1987 work force reduction. *See Allegri v. Providence–St. Margaret Health Center,* 9 Kan.App.2d 659, 664, 684 P.2d 1031 (1984) (overruling entry of summary judgment

on issue of existence of implied contract based upon employment manual and statements of employer).

6. Plaintiffs claim that they were not told that they could remain as salaried employees in different positions at their home units instead of taking the special separation incentive package or returning to the hourly rolls.

orously dispute this assertion, claiming that they were coerced into returning to the hourly rolls. They argue that defendant gave them only two choices, return to the hourly status or be fired, and that this amounted to duress.

Regardless of the merits of the duress argument, GM is not entitled to summary judgment on its waiver defense. A waiver is an intentional, voluntary relinquishment of a known right, or some positive act or inaction that is inconsistent with the contractual right allegedly waived. *United American State Bank & Trust Co. v. Wild West Chrysler Plymouth, Inc.*, 221 Kan. 523, 526, 561 P.2d 792 (1977). The forms the plaintiffs signed when they returned to hourly wage status merely document that plaintiffs agreed to this change in employment status; they do not contain any language releasing GM from any previous claims. Moreover, genuine issues of material fact remain regarding whether the plaintiffs voluntarily signed those forms and whether they did so under such circumstances as would constitute a contractual waiver. Summary judgment is therefore inappropriate.

Because genuine issues of material fact remain regarding the applicability of the alleged implied contract and whether the contract was breached, GM's motion for summary judgment on this cause of action must be denied.

### C. Plaintiff Leavitt

■ The case of plaintiff William Leavitt is different, however. Leavitt concedes that his claim only relates to GM's post–1987 conduct. He claims, in essence, that he was improperly reclassified as a temporary employee in 1988 in violation of the employee manual's procedures. This conduct is outside the scope of the plaintiffs' case theory as set forth in the Pretrial Order. Plaintiffs maintained in the Pretrial Order that all breaches of the contract occurred in 1987, and that the breaches fell into one or more of nine specified categories. GM's conduct with regard to plaintiff Leavitt did not implicate any of the nine

alleged categories of breach, and it did not occur in 1987.

■ A court has discretion to exclude those issues and claims not set forth in the Pretrial Order. *Perry v. Winspur*, 782 F.2d 893, 894 (10th Cir.1986) ("It is well established that unless the court modified its pretrial order, the parties are bound to its contents and may not contradict its terms."); *Hullman v. Board of Trustees of Pratt Community College*, 732 F.Supp. 91, 92 (D.Kan.1990), *aff'd*, 950 F.2d 665 (10th Cir.1991); Fed.R.Civ.P. 16. "A plaintiff cannot escape the binding effect of the pretrial order by raising new issues in a response to the defendant's motion for summary judgment." *Hullman*, 732 F.Supp. at 92. Yet, that is exactly what Mr. Leavitt attempts to do in this case. GM is therefore entitled to summary judgment with respect to the claims asserted by plaintiff Leavitt.

### III. DISCRIMINATION CLAIMS

In addition to the implied contract claims, seven of the fifteen plaintiffs challenge GM's staffing decisions as discriminatory under federal civil rights laws. GM has also moved for summary judgment as to those claims. Although the nature of these claims varies depending upon the factual circumstances surrounding each plaintiff's employment at GM, the court will consider the claims by category, emphasizing specific issues related to individual plaintiffs as appropriate.

### A. Title VII Claims

Title VII prohibits employers from discriminating in the work force on the basis of race, color, religion, sex, or national origin. 42 U.S.C. §§ 2000e to 2000e–17. The plaintiffs' claims in this case are premised on a disparate treatment theory. Disparate treatment occurs when "the employer simply treats some people less favorably than others" because of their race or other protected status. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335, 97 S.Ct. 1843, 1854, 52 L.Ed.2d 396 (1977). To establish a claim of disparate treatment, the plaintiffs must prove by a preponderance of the evidence

that the defendant had a discriminatory motive in making its employment decision. *See Ortega v. Safeway Stores, Inc.*, 943 F.2d 1230, 1236 (10th Cir.1991). The plaintiffs' burden may be satisfied either with direct proof of discriminatory intent, or by "the series of shifting evidentiary burdens that are 'intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination.'" *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 986, 108 S.Ct. 2777, 2784, 101 L.Ed.2d 827 (1988) (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 255 n. 8, 101 S.Ct. 1089, 1094 n. 8, 67 L.Ed.2d 207 (1981)).

Under the shifting burden of proof scheme established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and modified by *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the plaintiffs bear the initial burden of establishing a prima facie case of discrimination. If they establish a prima facie case, the burden of production shifts to the defendant to come forward with a legitimate, nondiscriminatory reason for its actions. *Watson*, 487 U.S. at 986, 108 S.Ct. at 2784; *Drake v. City of Fort Collins*, 927 F.2d 1156, 1160 (10th Cir. 1991). The plaintiffs then must have an opportunity to show that the reason articulated by the defendant is merely a pretext for discrimination. *MacDonald v. Eastern Wyoming Mental Health Center*, 941 F.2d 1115, 1119 (10th Cir.1991). The ultimate burden of persuasion remains at all times, however, with the plaintiffs. *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1094.

### 1. Race Discrimination Claims

■ Plaintiffs Berry, Gold, and Scott bring claims of racial discrimination under Title VII against GM. They contend that GM discriminatorily selected white employees for salaried positions at the new plant who had less corporate length of service and the same or lesser performance ratings than the plaintiffs. Rather than follow the procedures for transferring salaried employees allegedly established in the employment manual, these plaintiffs argue that GM allowed department heads to choose employees to staff the new facility based upon arbitrary criteria, including race.

■ To establish a prima facie case of disparate treatment as a result of the defendant's failure to hire, transfer, or promote, the plaintiffs must show (1) that they are members of a protected group; (2) that they were qualified for the positions sought; and (3) that they were rejected under circumstances that give rise to an inference of unlawful discrimination. *See Coe v. Yellow Freight System, Inc.*, 646 F.2d 444, 448-49 (10th Cir.1981).[7] GM claims that plaintiffs Berry, Gold, and Scott have not established a prima facie case of racial discrimination.

It is uncontroverted that each of these plaintiffs was within a protected group. GM primarily argues that they were not entitled to be transferred to the new plant because the provisions of the employment manual did not apply to the 1987 work force reduction, and that even if they were entitled to a salaried position at the GM-10 facility, they relinquished that right when they voluntarily returned to the hourly rolls. GM characterizes the claims asserted by these plaintiffs as alleging that they were discriminatorily denied salaried positions *of their choosing*, not that they were denied any salaried job. GM contends that

---

7. GM articulates a different prima facie case standard for these claims. The formulation of the prima facie test in Title VII cases is largely dependent upon the underlying facts of the case. *See Carino v. University of Oklahoma Bd. of Regents*, 750 F.2d 815, 818 (10th Cir.1984) (prima facie test standards must be flexible and tailored to discern violations of Title VII); *Carlile v. South Routt School District RE-3J*, 739 F.2d 1496, 1499 (10th Cir.1984). The standard proposed by GM is used most often for claims

of discrimination in the terms and conditions of employment, *i.e.*, bonuses, vacations, or fringe benefits. *See, e.g., Boyd v. Telecable of Overland Park, Inc.*, 752 F.Supp. 388 (D.Kan.1990) (bonuses); *Rodriguez v. Wolgast*, No. 85-4032-C (D.Kan. May 8, 1989) (1989 WL 60299) (no smoking policy). The claims in the case at bar, however, relate more to a discriminatory failure to transfer, promote, or hire the plaintiffs, making the prima facie standard announced in *Coe* more appropriate.

they were given the option of taking a different salaried job in addition to the options of returning to the hourly work force or taking the SSIP.

In light of the court's disposition of the implied contract claims, genuine issues of fact remain regarding the plaintiffs' entitlement to salaried positions at the new facility. Plaintiffs also raise genuine questions of fact about the voluntariness of their return to the hourly rolls and whether they were given the option of taking another salaried position.[8] Plaintiffs claim that other white employees with less corporate length of service were chosen to staff the GM–10 plant rather than plaintiffs.

GM did not use length of service as a criterion for selecting those employees who would be transferred, but instead allowed department heads to choose whom they wanted on the basis of factors that the individual department heads felt were important. For instance, plaintiff Berry's supervisor chose transferrees based upon such factors as flexibility and ability to learn different positions, "self-motivation or self-starter qualities," ability to work well with people and the union, and trustworthiness. Plaintiff Scott's supervisor used factors such as flexibility, education, ability to do a multiplicity of tasks, and ability to work together with a team. Plaintiff Gold's supervisor considered problem solving ability, "ownership of a problem," self-starter characteristics, and ability to get along with people. Evidence of such subjective, standardless decision making, "which is a convenient mechanism for discrimination," is sufficient to raise an inference of discriminatory motive. *Boykin v. Georgia–Pacific Corp.*, 706 F.2d 1384, 1390 (5th Cir.1983), *cert. denied,* 465 U.S. 1006, 104 S.Ct. 999, 79 L.Ed.2d 231 (1984). Based upon its review of the facts presented by the parties, the court concludes that these plaintiffs have satisfied their burden of making out a prima facie case of race discrimination.

GM argues that even if the plaintiffs state a prima facie case, there were legitimate, nondiscriminatory reasons for its decision not to award them salaried jobs in the new plant. GM claims that transfer decisions were made equally with regard to both African–American and non-African-American workers. Based upon the factors considered by the plaintiffs' supervisors, GM argues that the plaintiffs were inferior to those who were chosen to staff the GM–10 plant. These are facially legitimate, nondiscriminatory reasons for GM's employment decisions. The burden therefore shifts back to the plaintiffs to show that these reasons are merely a pretext for unlawful discrimination.

The burden of establishing pretext "merges with plaintiff's ultimate burden of proving intentional discrimination." *MacDonald v. Eastern Wyoming Mental Health Center,* 941 F.2d 1115, 1119 (10th Cir.1991). The plaintiffs may satisfy this burden either directly, with evidence that GM acted with actual discriminatory motives, or indirectly. *Drake v. City of Fort Collins,* 927 F.2d 1156, 1160 (10th Cir. 1991).

Plaintiffs claim that members of GM's management repeatedly made racial slurs and comments in the work place. When Mr. Berry reported to GM management that one of his employees had been called a "nigger" by another white employee, Mr. Berry was allegedly told, "In this day and age, that shouldn't bother you." Comments like these allegedly were made over a period of more than ten years. Racially biased comments such as these, especially when made continuously over a period of years, are sufficient to create a triable issue of pretext. *Carter v. Sedgwick County, Kansas,* 705 F.Supp. 1474, 1479 (D.Kan.1988) (Kelly, J.), *modified in part,* 929 F.2d 1501 (10th Cir.1991). Such statements are probative of discriminatory intent as to all of the plaintiffs who assert race discrimination claims, regardless of

---

**8.** Many of the plaintiffs contend that they were given only three options by GM: accept the SSIP, return to hourly status, or be fired. Some also claim that they attempted to add qualifying statements on the forms authorizing their return to the hourly rolls, such as "refuse to sign," but GM officials would not allow them to do so.

whether the alleged comments were directed at them when made. *See Stumph v. Thomas & Skinner, Inc.*, 770 F.2d 93, 97 (7th Cir.1985). Plaintiffs have therefore sustained their burden of establishing that there are genuine issues of fact for trial on their race discrimination claims under Title VII. GM's motion for summary judgment on these claims is denied.

## 2. Sex Discrimination Claims

■ Plaintiff Howell contends that GM discriminated against her based upon her sex in violation of Title VII when GM transferred male employees to the new plant who had fewer years of corporate service than she.[9] To establish a prima facie case of sex discrimination, Ms. Howell must show that (1) she was a member of a protected class; (2) she was qualified for the position she sought; (3) she was denied the position; and (4) the position remained open or was filled by others with similar qualifications who were outside the protected group. *Carlile v. South Routt School Dist. RE–3J*, 739 F.2d 1496, 1500 (10th Cir.1984); *see also Mortensen v. Callaway*, 672 F.2d 822, 823 (10th Cir.1982).

Ms. Howell is able to name two male employees who were transferred to the GM–10 plant in the position that she sought. Although these employees may not have had the same salary classification as Ms. Howell, there are no facts in the record to indicate that they were any more qualified for the position than Ms. Howell. Thus, the court concludes that she has sufficiently stated a prima facie case of sex discrimination.

■ GM claims that Ms. Howell was less qualified than those transferred based upon the criteria used by her supervisor for selecting employees to staff the new plant in Howell's department and job. Ms. Howell's supervisor considered such factors as general performance, people skills, and initiative. As with allegations of race discrimination, the use of such subjective criteria " 'entitles the plaintiff "to the benefit

of an inference of discrimination," ' " especially when the evaluators are not members of the protected group. *Pitre v. Western Elec. Co.*, 843 F.2d 1262, 1271–72 (10th Cir.1988) (quoting *Burrus v. United Tel. Co.*, 683 F.2d 339, 342 (10th Cir.), *cert. denied*, 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982)) (district court properly found pretext in sex discrimination case when defendant considered subjective factors such as "ability, performance, potentiality, . . . and the needs of the business" in its employment decision). The individual who made the staffing decisions in Ms. Howell's department was male.

■ In addition, Ms. Howell alleges that another supervisor sexually harassed her on the job. Evidence of such harassment also tends to create an inference of discrimination. *See Pitre*, 843 F.2d at 1270. Based upon the record as a whole, plaintiff Howell has satisfied her summary judgment burden by producing sufficient evidence that GM's articulated reasons for not transferring her were pretextual.

## 3. National Origin Discrimination

Plaintiff DiDonna's Title VII action is premised upon GM's failure to transfer her to the GM–10 plant in the capacity she held at the old Fairfax facility. She retained salaried positions at GM after the 1987 downsizing, but in a different capacity than the one she held before. Ms. DiDonna claims that GM refused to transfer her to the new plant as a timekeeper in the financial department because of her Philippine national origin.

■ Ms. DiDonna has stated a prima facie case of national origin discrimination against GM: she is a member of a protected group; she was qualified for the position that she sought; and she was denied the transfer under circumstances that could give rise to an inference of discrimination. *See Carino v. University of Oklahoma Bd. of Regents*, 750 F.2d 815, 818 (10th Cir.1984). GM claims that she was not chosen for this position at the new

---

**9.** Plaintiff Berry also brought a claim of sex discrimination against GM, but he has abandoned that claim.

plant because she had fewer years of service with the company than those who were transferred and because she had less favorable performance evaluations.[10] These are facially neutral, legitimate reasons for the employment decision made by GM. The burden of production then is shifted back to Ms. DiDonna to come forward with evidence that these reasons are pretextual.

■ The evidence viewed in a light most favorable to Ms. DiDonna does not suggest that the reasons articulated by GM are a pretext for discrimination. Although she argues that she previously had been denied a promotion because her supervisor felt that her accent would prohibit her from successfully fulfilling the requirements of the new position, this allegation alone is insufficient to raise an inference of discriminatory intent with respect to the 1987 employment decision.[11] *See Clark v. A.T. & S.F. Ry.*, 731 F.2d 698, 702 (10th Cir.1984). Her other allegations of pretext relate to GM's alleged failure to comply with the procedures in its employment manual. Even if these allegations are true, they do not raise an inference that, but for her national origin, Ms. DiDonna would have been treated differently. *See id.* GM is therefore entitled to summary judgment on plaintiff DiDonna's claim of national origin discrimination under Title VII.[12]

4. Retaliation

■ Title VII also proscribes retaliation by an employer against an employee for filing a complaint with the Equal Employment Opportunity Commission (EEOC). 42 U.S.C. § 2000e–3(a). Plaintiffs Berry, DiDonna, Gold, Howell, Hurt, McCauley, and Scott have filed claims against GM for alleged retaliatory acts taken by GM after these plaintiffs filed charges with the EEOC. The prima facie requirements for a showing of retaliation are (1) employee participation in a Title VII proceeding; (2) adverse action by the employer after or during the employee's participation; and (3) a causal connection between the employer's action and the employee's participation. *Boyd v. Telecable of Overland Park, Inc.*, 752 F.Supp. 388, 394 (D.Kan.1990).

■ GM's primary arguments against the claims of retaliation are that they were not included within the discrimination charges filed by the plaintiffs with the EEOC and that the plaintiffs cannot demonstrate any adverse action take by GM against them after or during the time those charges were brought. After considering the various claims brought by each plaintiff, the court concludes that GM's motion should be granted against plaintiffs Berry, Gold, McCauley, Scott, and DiDonna. Plaintiffs Berry, Gold, Scott, and McCauley returned to the hourly rolls in May of 1987. Berry filed his charge against GM with the EEOC in November of 1987; Gold filed his charge in December of 1987; McCauley filed his charge in April of 1988; and Scott

---

**10.** Unlike other supervisors who used subjective and standardless criteria to choose employees for the new facility, plaintiff DiDonna's supervisor used length of service and performance evaluations to make transfer decisions. These factors do not give rise to the same inference of discrimination that follows when subjective criteria are used. Interestingly, these are the same criteria that the plaintiffs contend GM was required to use under the terms of the alleged employment contract.

**11.** Ms. DiDonna cites only this one isolated incident of allegedly discriminatory treatment based upon her national origin to support her claim. Such an incident is distinguishable from the continuous use of racial epithets by GM management alleged by plaintiff Berry, which if true could have created an ongoing atmosphere of racial animosity in the work force. *See Clark v. A.T. & S.F. Ry.*, 731 F.2d 698, 701 (10th

Cir.1984) (isolated comments were insufficient to raise inference of discriminatory intent); *Carter v. Sedgwick County, Kansas*, 705 F.Supp. 1474, 1479 (D.Kan.1988) (continuous racial comments created an inference of discrimination).

**12.** To the extent that Ms. DiDonna's complaint can be read to assert a claim against GM of discriminatorily failing to recall her to other positions, GM is entitled to summary judgment on that claim as well. Ms. DiDonna alleges that she trained other employees for positions to which she was not recalled after being laid off in 1988. Yet, there is no evidence in the record that the individuals that she trained were retained in those positions by GM after Ms. DiDonna was laid off or that others with less seniority were recalled to those positions ahead of her.

filed his EEOC charge in January of 1988. None of these plaintiffs has presented any evidence that GM took adverse employment action against them *after* they filed their EEOC complaints.[13] Because these plaintiffs have not stated a prima facie case of retaliation under Title VII, GM's motion for summary judgment on this claim is granted.[14]

GM's motion for summary judgment is granted as to plaintiff DiDonna's retaliation claim as well. Although she did not return to the hourly rolls and therefore was subject to recall into salaried positions for which she was qualified, she has presented no evidence of any retaliatory conduct taken by GM after she filed her EEOC complaint. DiDonna's assertions that other, less senior employees were recalled ahead of her are not supported by the record. She has therefore failed to meet her burden under *Anderson v. Liberty Lobby*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986), and GM is entitled to summary judgment.

Plaintiffs Hurt and Howell, however, have presented retaliation claims that survive GM's motion. Mr. Hurt's initial EEOC charge was made in April of 1987. He claims that GM took adverse employment action against him in May of 1987 by refusing to transfer him to the new facility. As GM itself notes in its brief, such "protected conduct closely followed by adverse action" can demonstrate the causal connection required to state a prima facie case of retaliation. *Burrus v. United Telephone Co.*, 683 F.2d 339, 343 (10th Cir.), *cert. denied*, 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982). Although GM has articulated legitimate, nondiscriminatory reasons for its employment actions against Mr. Hurt, genuine issues of fact remain regarding the issue of pretext, making summary judgment inappropriate.

Similarly, GM's motion for summary judgment against plaintiff Howell's retaliation claim must be denied. Ms. Howell, who retained a salaried position in other departments after the 1987 downsizing, alleges that other employees were transferred to her former department ahead of her, that she was denied a bonus and vacation time, and that she was assigned to demeaning tasks and long hours after she filed her EEOC charges. Like plaintiff Hurt, these alleged actions took place a short time after Ms. Howell filed her second complaint with the EEOC in October of 1987. These facts are sufficient to state a prima facie case of retaliation, and as the court held on Ms. Howell's sex discrimination claim, genuine issues of material fact on the issue of pretext preclude an entry of summary judgment in favor of GM.

## B. Age Discrimination Claims

In addition to their claims under Title VII, plaintiffs Berry, Gold, Howell, Hurt, and McCauley have asserted causes of action against GM for age discrimination under the ADEA. The prima facie case requirements and burden of proof allocations for age discrimination cases are identical to those in Title VII cases. *EEOC v. Sperry Corp.*, 852 F.2d 503, 507 (10th Cir. 1988). The plaintiffs retain the burden of showing that age was a "determining factor" in the defendant's decision. *Id.* at 507.

To establish a prima facie case of age discrimination in a reduction in force situation like the one at bar, plaintiffs must show that (1) they were within the protected group; (2) they were adversely affected by the employer's employment decision; (3) they were qualified for the position at issue; and (4) evidence exists, either circum-

---

**13.** Plaintiffs contend that GM took adverse employment action against them by recalling other, less senior employees to positions for which the plaintiffs were qualified after May 1987. By the time these other employees were allegedly recalled, however, the plaintiffs had opted to return to the hourly work force and were no longer subject to recall into salaried positions.

Thus, even if GM did recall other employees, this action was not adverse to the plaintiffs.

**14.** The court notes that many of the allegations made by the plaintiffs relating to their claims of retaliation are not properly supported in the record. Deposition pages cited by plaintiffs often were not attached to their memoranda in contravention of D.Kan. Rule 206(c).

stantial or direct, from which the fact finder might conclude that the employer intended to discriminate when it made the employment decision. *See Whitten v. Farmland Industries, Inc.,* 759 F.Supp. 1522, 1532 (D.Kan.1991); *see also Branson v. Price River Coal Co.,* 853 F.2d 768, 771 (10th Cir.1988); *Wherly v. American Motors Sales Corp.,* 678 F.Supp. 1366, 1377 (N.D.Ind.1988). GM's arguments on these claims are essentially the same as those it set forth against the plaintiffs' Title VII claims. The principal issue for purposes of the instant motions is whether the fourth element of the prima facie case test has been met.

The plaintiffs argue that, by transferring younger employees to the new GM–10 plant who had fewer years of corporate experience and equal or inferior performance ratings, GM evidenced its intention to retain a younger work force at the expense of older employees. They also point to age related comments made by members of GM's management as evidence of discriminatory intent. According to plaintiff Berry, these statements indicate that GM intended to use the 1987 work force reductions to weed out some of the older members of its work force. Statements such as "I think they're going to want younger people over there" were allegedly made by several members of GM's management. These comments are probative of discriminatory intent and satisfy the plaintiffs' burden of establishing a prima facie case of age discrimination. *See Smith v. Consolidated Mutual Water Co.,* 787 F.2d 1441, 1442 (10th Cir.1986); *see also Stumph v. Thomas & Skinner, Inc.,* 770 F.2d 93, 97 (7th Cir.1985) (statements probative of discriminatory intent even if not directed at plaintiff when made).

██ GM alleges that the staffing decisions at the new plant were based upon the same facially legitimate, nondiscriminatory

reasons it articulated in response to the plaintiffs' Title VII claims. It is therefore up to the plaintiffs to come forward with sufficient evidence to satisfy the court that these reasons were merely a pretext for unlawful discrimination. *Drake v. City of Fort Collins,* 927 F.2d 1156, 1160 (10th Cir.1991).

For many of the same reasons set forth above regarding the race discrimination claims against GM, the court concludes that the plaintiffs have satisfied their burden of establishing a triable issue of pretext. GM relies heavily on the argument that a statistical comparison of the work force before and after the 1987 downsizing of the specific departments to which the plaintiffs belonged indicates that GM did not discriminate on the basis of age. While these statistics may be probative, they are certainly not determinative of the issue of intentional discrimination. As plaintiffs point out, the sample sizes involved are extremely small, making a comparison of the work force before and after the reduction difficult. *See Fallis v. Kerr–McGee Corp.,* 944 F.2d 743, 746 (10th Cir.1991).[15] GM's motion for summary judgment on these claims is therefore denied.

██ Mr. Hurt has also filed a claim of age discrimination based upon incidents apart from the 1987 downsizing. This claim is premised upon GM's alleged failure to promote Mr. Hurt to the position of a sixth level specification engineer from January of 1985 to the time he returned to the hourly rolls in May of 1987. GM argues that Mr. Hurt was not promoted because he had poor performance ratings compared to the other candidates for promotion. Assuming for the purposes of this motion that Mr. Hurt's allegation states a prima facie case of age discrimination, GM has articulated a legitimate, nondiscriminatory reason for its actions. Mr. Hurt has come forward with no evidence that GM's reason

**15.** GM cites *Allen v. Denver Public School Bd.,* 928 F.2d 978 (10th Cir.1991), as support for the proposition that small sample sizes can be relied upon to determine whether an employer discriminated. In *Allen,* the court relied in part on a comparison of the manner in which ten employees were treated to conclude that the plain-

tiff had not established a course of discriminatory conduct. *Id.* at 986. In that situation, however, it was the plaintiff who attempted to use the statistical comparison, without any other probative evidence, to prove her claim of discrimination. That is not the case here.

for failing to promote him from January of 1985 to May of 1987 was related to his age. Thus, GM is entitled to summary judgment on this claim of discrimination.

### C. Section 1981 Claims

Plaintiffs Berry, DiDonna,[16] Gold, and Scott also allege causes of action against GM under 42 U.S.C. § 1981. Section 1981 protects the rights of all persons "to make and enforce contracts," regardless of their race. 42 U.S.C. § 1981. The United States Supreme Court's decision in *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), however, limits the applicability of section 1981 to discrimination claims. Under *Patterson*, only two rights are protected: (1) the right to make contracts, and (2) the right to enforce contracts. Post-formation conduct is not protected. *Id.* at 176.

■ The *Patterson* decision, however, provided an exception for promotion claims. Plaintiffs can still bring actions for failure to promote under section 1981 when "the nature of the change in position was such that it involved the opportunity to enter into a new contract with the employer.... Only where the position rises to the level of an opportunity for a new and distinct relation between the employee and the employer is such a claim actionable...." *Simmons v. Security Benefit Group, Inc.*, No. 87–4225–S, slip op. at 19, 1991 WL 17681 (D.Kan. Jan. 31, 1991) (1991 U.S.Dist.LEXIS 1664) (Saffels, J.) (quoting *Patterson*, 491 U.S. at 185, 109 S.Ct. at 2377). GM contends that the plaintiffs' claims are no longer cognizable under section 1981 because they do not relate to contract formation or enforcement and they are not promotion claims.

■ Plaintiffs contend that GM discriminatorily denied them the opportunity to continue as salaried employees at the new GM–10 plant in the positions that they had at the old facility. Such claims relate not to the formation of a new contract or relationship with GM, but to the continuation of a previous contract or relationship. Plaintiffs provide no evidence that their duties and responsibilities would have changed had they been transferred. They were not denied the opportunity to enter into a new contract with GM. The plaintiffs who opted to return to the hourly rolls may be able to claim that they were discriminatorily demoted. Demotion claims, however, also do not involve contract formation or enforcement and are not actionable under section 1981. *Guliford v. Beech Aircraft Corp.*, 768 F.Supp. 313, 320 (D.Kan.1991); *Jordan v. U.S. West Direct Co.*, 716 F.Supp. 1366, 1368 (D.Colo.1989).

■ GM is also entitled to summary judgment to the extent that the plaintiffs' claims can be read to assert causes of action under section 1981 for retaliation. Although retaliation against individuals for bringing discrimination claims may be actionable under section 1981 in some instances, *see, e.g., Guliford*, 768 F.Supp. at 318 n. 1 (if plaintiff's retaliation claim related to a promotion that would have amounted to a new contract, plaintiff may have been able to bring § 1981 claim for any retaliatory action impacting on the promotion taken in response to the filing of an EEOC charge), the plaintiffs' allegations in this case do not involve such circumstances. Plaintiffs do not allege that GM prevented them from filing EEOC charges or bringing this lawsuit, or that GM refused to enter into new contractual relations with them in response to any protected activity. Thus, plaintiffs have not stated viable claims of retaliation under section 1981. *Lee v. Farmers Insurance Co.*, No. 90–2185–V, slip op. at 5 (D.Kan. Apr. 15, 1991) (1991 WL 80134).

---

**16.** Ms. DiDonna's section 1981 claim is premised not on racial discrimination, but on national origin discrimination. Although section 1981 outlaws only discrimination on the basis of race, "the line between national origin discrimination claims under Title VII and racial discrimination claims under § 1981 is 'not a bright one.'" *Daemi v. Church's Fried Chicken, Inc.*, 931 F.2d 1379, 1387 n. 7 (10th Cir.1991) (quoting *Saint Francis College v. Al–Khazraji*, 481 U.S. 604, 614, 107 S.Ct. 2022, 2028, 95 L.Ed.2d 582 (1987)). Ms. DiDonna's claim, if properly supported, would be cognizable under section 1981 as well as Title VII. *Daemi*, 931 F.2d at 1387 n. 7 (discrimination claim premised on Iranian descent cognizable under section 1981).

To avoid the preclusive effect of *Patterson* on their section 1981 claims, plaintiffs argue that the court should give retroactive effect to the recently enacted Civil Rights Act of 1991. One of the purposes of that legislation was to supersede the *Patterson* decision. Although the Tenth Circuit has not yet ruled on the retroactivity of the 1991 Act, this court has held that the Act should not be given retroactive effect. *Johnson v. Mast Advertising and Publishing, Inc.*, No. 90–2451–L, slip op. at 24 (D.Kan. Feb. 10, 1992) (1992 WL 41352); *Simons v. Southwest Petro–Chem, Inc.*, No. 90–2243–V, 1992 WL 25218 (D.Kan. Jan. 22, 1992). Plaintiffs' section 1981 claims are therefore precluded by *Patterson* and GM is entitled to summary judgment.

## IV. MOTION FOR SEPARATE TRIALS

■ GM has requested that the court sever the claims of each of the plaintiffs in this action for separate trials pursuant to Fed.R.Civ.P. 20 and 42(b) (Doc. # 148). GM claims that hearing all of the various theories and issues presented by the plaintiffs in one trial would be prejudicial to GM and confusing to the jury.

Separate trials may be ordered under Rule 42(b) for convenience or to avoid prejudice. The decision to order separate trials is within the discretion of the court. 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2388, at 283 (1971 & Supp. 1991).

■ The court concludes that the claims brought by the plaintiffs in this case are properly joined under Fed.R.Civ.P. 20(a) because they arise "out of the same transaction, occurrence, or series of transactions or occurrences" and implicate common questions of fact and law. Separation of these claims for trial would not enhance judicial economy or convenience. *See Mosley v. General Motors Corp.*, 497 F.2d 1330, 1332 (8th Cir.1974). GM's motion for separate trials is therefore denied.

## V. CONCLUSION

It is therefore ordered by the court that defendant's motion for partial summary judgment on the implied contract claims (Doc. # 82) is denied as to all plaintiffs except plaintiff Leavitt, as to whom GM's motion is granted. Plaintiff Leavitt's claims against GM are dismissed with prejudice.

It is further ordered that plaintiffs' motion to supplement the record (Doc. # 166) is granted.

It is further ordered that defendant's motion for partial summary judgment on the discrimination claims of plaintiff Berry (Doc. # 99) is granted in part and denied in part. The motion is:

(1) denied as to plaintiff Berry's race discrimination claim under Title VII;

(2) granted as to plaintiff Berry's sex discrimination claim under Title VII;

(3) granted as to plaintiff Berry's retaliation claim under Title VII;

(4) denied as to plaintiff Berry's age discrimination claim under the ADEA; and

(5) granted as to all of plaintiff Berry's claims under 42 U.S.C. § 1981.

It is further ordered that defendant's motion for partial summary judgment on the discrimination claims of plaintiff Gold (Doc. # 103) is granted in part and denied in part. The motion is:

(1) denied as to plaintiff Gold's race discrimination claim under Title VII;

(2) granted as to plaintiff Gold's retaliation claim under Title VII;

(3) denied as to plaintiff Gold's age discrimination claim under the ADEA; and

(4) granted as to all of plaintiff Gold's claims under 42 U.S.C. § 1981.

It is further ordered that defendant's motion for partial summary judgment on the discrimination claims of plaintiff Scott (Doc. # 107) is granted in part and denied in part. The motion is:

(1) denied as to plaintiff Scott's race discrimination claim under Title VII;

(2) granted as to plaintiff Scott's retaliation claim under Title VII; and

(3) granted as to all of plaintiff Scott's claims under 42 U.S.C. § 1981.

It is further ordered that defendant's motion for partial summary judgment on the discrimination claims of plaintiff Di-Donna (Doc. # 97) is granted. All of plaintiff DiDonna's discrimination claims against defendant are dismissed with prejudice.

It is further ordered that defendant's motion for partial summary judgment on the discrimination claims of plaintiff McCauley (Doc. # 109) is granted in part and denied in part. The motion is:

(1) granted as to plaintiff McCauley's retaliation claim under Title VII; and

(2) denied as to plaintiff McCauley's age discrimination claim under the ADEA.

It is further ordered that defendant's motion for partial summary judgment on the discrimination claims of plaintiff Howell (Doc. # 105) is denied in its entirety.

It is further ordered that defendant's motion for partial summary judgment on the discrimination claims of plaintiff Hurt (Doc. # 101) is granted in part and denied in part. The motion is:

(1) denied as to plaintiff Hurt's retaliation claims under Title VII; and

(2) denied as to plaintiff Hurt's age discrimination claim under the ADEA for failure to transfer, but

(3) granted as to plaintiff Hurt's age discrimination claim under the ADEA for failure to promote.

It is further ordered that defendant's motion for separate trials (Doc. # 148) is denied.

IT IS SO ORDERED.