**Marie AQUILINO, Ph.D., Plaintiff,**

v.

**UNIVERSITY OF KANSAS, Defendant.**

**No. Civ.A. 99–2231–KHV.**

United States District Court,
D. Kansas.

Feb. 11, 2000.

Alan V. Johnson, Stephen D. Lanterman, Sloan, Listrom, Eisenbarth, Sloan & Glassman, Topeka, KS, W. Thomas Stratton, Topeka, KS, for Marie Aquilino.

Rose A. Marino, Office of General Counsel, University of Kansas, Lawrence, KS, Barbara L. McCloud, University of Kansas, Office of the General Counsel, Lawrence, KS, for University of Kansas.

### MEMORANDUM AND ORDER

VRATIL, District Judge.

Marie Aquilino, a former faculty member at the University of Kansas, filed suit against the university, alleging that it refused to promote her to Associate Professor and award her tenure because of her sex, and that it subsequently refused to hire her as an ad hoc faculty member or adjunct professor because she had filed a sex discrimination charge with the EEOC, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* as amended. The matter is before the Court on defendant's *Motion For Summary Judgment Against Plaintiff Aquilino* (Doc. # 23) filed December 15, 1999.

For reasons set forth below, the Court sustains the motion in part and overrules it in part.

### Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1538–39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. A "genuine" factual dispute requires more than a mere scintilla of evidence. *Id.* at 252, 106 S.Ct. 2505.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga,* 942 F.2d 737, 743 (10th Cir.1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Securities, Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir.1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. *Applied Genetics,* 912 F.2d at 1241.

"[W]e must view the record in a light most favorable to the parties opposing the motion for summary judgment." *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.,* 938 F.2d 1105, 1110 (10th Cir.1991). Summary judgment may be granted if the nonmoving party's evidence is merely color-

able or is not significantly probative. *Anderson,* 477 U.S. at 250–51, 106 S.Ct. 2505. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir.1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505.

### Factual Background

The following facts are uncontroverted, deemed admitted or, where disputed, viewed in the light most favorable to plaintiff.

In August 1991, plaintiff, a white female, started work at the University of Kansas ("KU") as a tenure track Assistant Professor in the Kress Foundation Department of Art History (KFDAH or Department).

In and after 1993, the KFDAH gave plaintiff annual reviews which evaluated three factors: teaching, research and service. In the spring of 1993, Dr. Edmund Eglinski, KFDAH chair, gave plaintiff an annual review which rated her teaching and research as "very good" and her service as "outstanding."[1] In response to the evaluation, plaintiff sent Dr. Eglinski a letter which stated that the evaluation was "neither fair or accurate in its reflection on my contribution to the department and I am alarmed by its implications for my third year [pre-tenure] review." Plaintiff also stated that she was "left with the impression that there is little demonstrable support for my work, for the perspective of my teaching, or for my interests as a junior faculty member." Dr. Eglinski responded by noting that plaintiff received "mixed" student evaluations and that students had complained about the pace of lectures, tests, plaintiff's inaccessibility outside of class and hostility toward student questions.

In November 1993, the KFDAH asked plaintiff to provide materials for her third-year (pre-tenure) review. One purposes of the third-year review is for the Department to inform tenure-track faculty members whether they are then on track for promotion and tenure, and to suggest areas of improvement. On March 1, 1994, after a meeting of the tenured faculty members of the KFDAH, Dr. Eglinski consolidated the comments of the department and gave plaintiff a generally favorable pre-tenure review. Dr. Eglinski noted that "your performance as a teacher shows great promise [and is adequate to excellent] but there is a problem of perception that you are inaccessible and unsympathetic. Your research and service are appropriate for this stage of your career and meet our expectations." Plaintiff asked Dr. Eglinski how to address the "perception" problem regarding her teaching. Dr. Eglinski told her that she should be more like David (Dr. David Cateforis, one of plaintiff's male colleagues) and to "smile more." In the review, Dr. Eglinski wrote that "[i]t behooves you to soften your manner when advising students." One of the Department members, Dr. Stephen Goddard, wrote Dr. Eglinski a letter which noted his disagreement with the KFDAH evaluation. Dr. Goddard stated that he was surprised that the emotions of his colleagues "ran so hot" regarding plaintiff. When plaintiff attempted to discuss her third-year review with Dr. Charles Eldredge, he told her that she should drop her inquiries and leave the matter alone.

A sub-committee of the College Committee on Appointments, Promotion and Tenure ("CCAPT") analyzed the third-year, pre-tenure reviews of four departments at KU. On March 15, 1994, the sub-committee sent Dr. Eglinski a letter regarding plain-

---

**1.** In each category the KFDAH rated faculty members as either *outstanding, very good,* good or unsatisfactory.

tiff's review. The sub-committee encouraged Dr. Eglinski to conduct an annual internal review of plaintiff based on (1) rigorous peer review of class visits, (2) student evaluations, (3) formal evaluation of research and (4) on-going evaluation of service quality and record. KFDAH implemented some but not all of these suggestions.

On April 19, 1994, Dr. Eglinski gave plaintiff her annual evaluation, rating her teaching and service as "superior" and her research as "outstanding." For teaching, Dr. Eglinski noted that "[t]here are still complaints about inaccessibility."

In February 1994, plaintiff was awarded the J. Paul Getty Postdoctoral Fellowship in the History of Art. As a condition of the fellowship, plaintiff requested and received a leave of absence for the 1994–95 academic year.

On May 1, 1995, Dr. Eglinski gave plaintiff an annual evaluation which again rated her teaching and service as "superior" and her research as "outstanding." Because of her leave of absence, the evaluation only included plaintiff's teaching and service for the first half of 1994.

On May 1, 1996, Dr. Linda Stone–Ferrier, the department chair (after Dr. Eglinski), sent plaintiff her annual evaluation, again rating her teaching and service as "superior" and her research as "outstanding." Plaintiff's evaluation for teaching and service carried over from her prior evaluation because due to her fellowship, she did not teach classes or perform typical service in early 1995.

On March 14, 1997, Dr. Stone–Ferrier gave plaintiff an annual evaluation which rated her teaching as "unable to evaluate," her research as "outstanding" and her service as "very good." Plaintiff received the rating of "unable to evaluate" because she did not solicit student evaluations from her classes and the KFDAH did not receive any student evaluations for two of plaintiff's classes. Dr. Stone–Ferrier asked plaintiff about the missing evaluations. Plaintiff stated that she forgot to distribute them. After discussions with plaintiff

and with her consent, Dr. Stone–Ferrier asked students to provide evaluations for the classes. The student evaluations ranged from "very good" to "excellent." After Dr. Stone–Ferrier received several evaluations, she asked Associate Dean Casagrande whether she should utilize the student evaluations. Dean Casagrande advised her that student evaluations solicited months after a course had been completed could not accurately reflect student opinions. Dean Casagrande instructed Dr. Stone–Ferrier to give plaintiff a rating of "unable to evaluate" for teaching. Although Dr. Stone–Ferrier did so, she included several *un*favorable student comments because plaintiff stated that it was not fair to omit all evaluations of her teaching. Dr. Stone–Ferrier also noted that plaintiff's rapport with students could be affected by the manner and style which she also exhibited in faculty meetings.

In March 1997, plaintiff wrote Dr. Stone–Ferrier, contesting the evaluation of her teaching because (1) Dr. Stone–Ferrier had not included any positive student comments, (2) plaintiff's "manner" had nothing to do with enrollment in her classes, (3) plaintiff's "manner" in a faculty meeting had nothing to do with her teaching and if anything, plaintiff's "demeanor in faculty meeting was (is) a result of being insulted, degraded, put down, and yelled at for six years." Plaintiff stated that she was "alarmed" by the evaluation.

Shortly before the KFDAH was set to act on plaintiff's application for promotion and tenure, it circulated a draft of "discipline expectations" to plaintiff and two other candidates (Dr. Amy McNair and Dr. David Cateforis). The KFDAH had initially drafted the discipline expectations in 1989 or 1990, for a prior candidate, and it used essentially the same expectations each year. In this instance, all three candidates objected to the draft because they thought that it did not accurately reflect their work and that it favored Dr. Cateforis because he had worked on museum catalogues and exhibition brochures. Dr.

Stone–Ferrier suggested that the candidates draft a revised statement and plaintiff did so after further consultation with Dr. Stone–Ferrier. Although the KFDAH did not adopt all of plaintiff's suggestions, it revised the discipline expectations to incorporate some of them. Plaintiff thought that at least two of the changes were significant and positive.

After plaintiff learned that Dr. Cateforis and Dr. McNair participated with a faculty member in selecting three of the external reviewers for the promotion and tenure decision, plaintiff asked Dr. Stone–Ferrier to help her select external reviewers. Dr. Stone–Ferrier agreed and allowed plaintiff to submit a list of six external reviewers together with a list of three individuals whom she did not want to be used as external reviewers. Dr. Stone–Ferrier consulted plaintiff and they agreed on a list of three external reviewers to be selected from the departmental list.

In October 1997, the KFDAH unanimously recommended against promotion and tenure for plaintiff and in favor of promotion and tenure for Dr. Cateforis and Dr. McNair.[2] Four of the six external referees for plaintiff recommended her for promotion and tenure. The KFDAH rated plaintiff "poor" in teaching, research and service, with an overall evaluation of "poor." The KFDAH rated Dr. Cateforis "exceptional" in teaching and service and "very good" in research, with an overall evaluation of "exceptional." In a letter to the CCAPT, Dr. Stone–Ferrier explained:

> [Dr. Aquilino] has published only one article, which was based on her dissertation, and two five-paragraph book reviews. The vast majority of her research efforts, as well as the $72,371.72 in fellowship and grants that she has received, have resulted in a 236–page

typescript that has yet to find a publisher.[3] ... Dr. Aquilino's scholarly record is seriously deficient in terms of both quality and quantity.

Additionally, the problems detailed in the Blue Form have been brought to Dr. Aquilino's attention over the last six and a half years in year-end merit evaluation letters as well as in her Third–Year Review letter.... Although Dr. Aquilino has received "very good" and "outstanding" ratings [on her annual and pre-tenure reviews], it should be kept in mind that these are in actual practice virtually the only two evaluations that any faculty member in the art history department receives. We expect a very high level of performance in research, teaching and service. The merit-evaluation letters are extremely difficult to compose because they are intended to acknowledge officially both accomplishments, as well as areas in need of improvement. However, on the other hand, we wish to support and encourage our untenured junior faculty in particular, and not to penalize them through merit evaluations for problems that can be dealt with less formally and less publicly. Additionally, the Chair is somewhat handicapped by the fact that the information on which he/she bases a merit evaluation judgment has been supplied only by the faculty member being reviewed. No third-party intervention affords correction and criticism as in the promotion and tenure process.... The research ratings were consistently "outstanding" because of the potential inherent in Dr. Aquilino's impressive fellowships; however, the promise of publication(s) resulting from such grant support has ultimately been disappointing.

---

2. On October 23, 1997, Dr. Goddard wrote Dr. Stone–Ferrier and suggested that the department change its vote on plaintiff's promotion and tenure. The KFDAH did not change its recommendation and reported to the CCAPT that it had reached a unanimous decision.

3. Plaintiff testified that a member of the UCPT informed her that a finished manuscript was a pretty good indication that it would be published. Dr. Stone–Ferrier, noted, however, that even if her manuscript was accepted for publication in the next year, her record "bodes poorly for future productivity."

Exhibit 15 to *Memorandum In Support Of Motion For Summary Judgment On Claims Of Plaintiff* (Doc. # 24) filed December 15, 1999.

In December 1997, the CCAPT also recommended against promotion and tenure for plaintiff and in favor of promotion and tenure for Dr. McNair and Dr. Cateforis. The CCAPT denied plaintiff promotion and tenure because of her lack of publication and the unanimous vote of her department. In March 1998, the Provost and the University Committee on Promotion and Tenure agreed. The Chancellor of KU, Dr. Robert Hemenway, followed the unanimous recommendations of the Provost, the UCPT, the CCAPT and the KFDAH, and awarded promotion and tenure to Dr. McNair and Dr. Cateforis but not to plaintiff. As a result, the KFDAH notified plaintiff that her employment would terminate at the end of the 1998–99 academic year.

In the spring of 1999, plaintiff applied for an adjunct faculty position with the Hall Center for the Humanities. Although the Hall Center for the Humanities supported plaintiff's appointment, the Provost rejected the appointment because he thought that it would not serve "a University purpose" and that it would be "inappropriate." In May, 1999, the KFDAH denied plaintiff an appointment as ad hoc faculty member in the department.

The Department of Latin American Studies and the Department of History supported plaintiff's nomination for ad hoc positions in those departments. On August 10, 1999, KU denied plaintiff's ad hoc appointment to the history department. The Dean of the Graduate School told the Department of Latin American Studies that an ad hoc position for plaintiff should be no problem. On August 30, 1999, however, KU denied plaintiff's ad hoc appointment to that department.

### Analysis

#### I. Sex Discrimination Claim

Plaintiff alleges that defendants violated Title VII by refusing to hire her for the Associate Professor position because of her sex. To prevail on her claim, plaintiff must establish that her sex was a determining factor in the challenged decision. *See Greene v. Safeway Stores, Inc.,* 98 F.3d 554, 557 (10th Cir.1996) (citing *Lucas v. Dover Corp.,* 857 F.2d 1397, 1400 (10th Cir.1988)). Plaintiff need not show that her sex was the sole reason for her non-selection, but she must show that her sex "made the difference" in the decision. *Greene,* 98 F.3d at 557 (quoting *EEOC v. Sperry Corp.,* 852 F.2d 503, 507 (10th Cir.1988)). She may meet this burden by direct or circumstantial evidence that her sex was a determining factor, or by the burden-shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–56, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *See MacDonald v. Delta Air Lines, Inc.,* 94 F.3d 1437, 1441 (10th Cir.1996). Defendants argue that as a matter of law, plaintiff cannot meet her burden under either approach.

Direct evidence, though rare, consists of "proof of an existing policy which itself constitutes discrimination," *Mosley v. Pena,* 100 F.3d 1515, 1519 (10th Cir.1996), or statements which on their face show that defendant "acted on [its] discriminatory beliefs." *Ramsey v. City & County of Denver,* 907 F.2d 1004, 1008 (10th Cir. 1990), *cert. denied,* 506 U.S. 907, 113 S.Ct. 302, 121 L.Ed.2d 225 (1992); *see Carney v. Pena,* 992 F.Supp. 1285, 1290 (D.Kan. 1998). "Statements which on their face are expressions of personal opinion, however, can only support an inference of discrimination if the trier of fact finds the inference reasonable, and so constitute only circumstantial or indirect evidence of discrimination against the plaintiff." *Mosley,* 100 F.3d at 1519–20 (quoting *Ramsey,* 907 F.2d at 1008).

Plaintiff claims that three statements by department chairs Eglinski and Stone–Ferrier constitute direct evidence of discrimination. When plaintiff asked Dr.

Eglinski how to address her "perception" problem noted in her third-year review, he told her to "smile more" and to "be more like David [Cateforis]." Dr. Eglinski also wrote that "[i]t behooves you to soften your manner when advising students." During plaintiff's 1997 annual review, the next department chair, Dr. Stone–Ferrier, criticized plaintiff's "manner and style" in class and in faculty meetings. To accept plaintiff's argument that these statements constitute direct evidence of sex discrimination, the jury would have to infer that Dr. Eglinski and Dr. Stone–Ferrier had a bias against female faculty members, that they acted on that bias and that they convinced others to do likewise. The statements by Dr. Eglinski and Dr. Stone–Ferrier are not direct evidence of sex discrimination. *See EEOC v. Wiltel, Inc.,* 81 F.3d 1508, 1514 (10th Cir.1996) (if trier of fact must infer that discrimination was a motivating factor, statement is not direct evidence); *Ramsey,* 907 F.2d at 1008 (direct evidence must show that defendant acted on its discriminatory belief).

The Court therefore evaluates plaintiff's claim under the burden-shifting framework established in *McDonnell Douglas.* To set forth a prima facie case of discrimination under *McDonnell Douglas,* plaintiff must show each of the following elements: (1) that she is a member of a protected class; (2) that she was qualified for the position sought; (3) that she was rejected; and (4) that defendant filled the position with someone who was not a member of the protected class. *See Thomas v. Denny's, Inc.,* 111 F.3d 1506, 1510 (10th Cir.), *cert. denied,* 522 U.S. 1028, 118 S.Ct. 626, 139 L.Ed.2d 607 (1997). Plaintiff's establishment of a prima facie case creates a presumption of unlawful discrimination. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

Defendant first argues that plaintiff has failed to show that she was qualified for the position of Associate Professor. Plaintiff has shown, however, that a majority of her external referees recommended that she receive the position and tenure. Plain-

tiff's evidence is sufficient to meet her prima facie burden as to her qualifications. *See Thomas,* 111 F.3d at 1510 (prima facie burden met through credible evidence that plaintiff is qualified even if employer disputes evidence; burden may be met through plaintiff's own testimony or that of co-workers); *see also Burrus v. United Tel. Co. of Kansas, Inc.,* 683 F.2d 339, 342 (10th Cir.) (subjective qualifications best evaluated at third stage of *McDonnell Douglas* analysis, not at prima facie stage), *cert. denied,* 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982); *Zahorik v. Cornell Univ.,* 729 F.2d 85, 93–94 (2d Cir.1984) (plaintiff may show she is qualified by showing that "some significant portion of the departmental faculty, referrants or other scholars in the particular field hold a favorable view on the question").

After plaintiff has established a prima facie case, the burden shifts to defendant to produce evidence that it took the adverse employment action for a legitimate nondiscriminatory reason. *See Greene,* 98 F.3d at 558; *Randle v. City of Aurora,* 69 F.3d 441, 451 (10th Cir.1995). Defendant must articulate and produce some evidence that it did not hire plaintiff for the Associate Professor position for a "facially legitimate and nondiscriminatory reason." *Aramburu v. Boeing Co.,* 112 F.3d 1398, 1403 (10th Cir.1997). Here, defendant has met this burden by stating that it did not select plaintiff because of deficiencies in her research, teaching and service.

As defendant has met its burden, the presumption of discrimination drops from the case and plaintiff must establish by a preponderance of the evidence "that the proffered reason was not the true reason for the employment decision." *Id.* Plaintiff may show pretext by establishing either that a discriminatory reason more likely motivated defendant or that its explanations are unworthy of credence. *See Rea v. Martin Marietta Corp.,* 29 F.3d 1450, 1455 (10th Cir.1994).

### A. *Plaintiff's Prior Evaluations*

 Plaintiff claims that her favorable annual reviews and positive third-year (pre-tenure) review indicate that defendant's proffered reason is a pretext for discrimination. A change in management's evaluation of employee performance does not by itself, however, raise an inference of pretext. *See Valdivia v. University of Kan. Med. Ctr.*, 24 F.Supp.2d 1169, 1174 (D.Kan.1998); *see also Viola v. Philips Med. Sys. of North Am.*, 42 F.3d 712, 717–18 (2d Cir.1994) (rejecting inference of discrimination or pretext from negative performance review after prior positive reviews); *Orisek v. American Institute of Aeronautics and Astronautics*, 938 F.Supp. 185, 188 (S.D.N.Y.1996) (same), *aff'd*, 162 F.3d 1148, 1998 WL 650257 (2d Cir.1998). "To hold otherwise would be to hold that things never change, a proposition clearly without a basis in reality." *Shabat v. Blue Cross Blue Shield*, 925 F.Supp. 977, 988 (W.D.N.Y. 1996) (internal quotations and citation omitted), *aff'd*, 108 F.3d 1370, 1997 WL 138836 (2d Cir.1997). An employer is entitled to change its evaluation of an employee over time, and in the context of a tenure-track faculty member, changes may be particularly likely if the tenure decision depends on a cumulative assessment of the work of the candidate. *See* Dr. Stone–Ferrier letter to CCAPT dated October 29, 1997 ("The research ratings were consistently 'outstanding' because of the potential inherent in Dr. Aquilino's impressive fellowships; however, the promise of publication(s) resulting from such grant support has ultimately been disappointing."), Exhibit 15 to *Memorandum In Support Of Motion For Summary Judgment On Claims Of Plaintiff* (Doc. # 24) filed December 15, 1999.

Further, although plaintiff's prior evaluations were generally positive, plaintiff received a number of critical remarks. In 1993, plaintiff stated that she was "alarmed" by the implications of her annual review on her third-year review. Plaintiff also stated that she thought that the department had not shown demonstrable support for her work, her teaching perspective or her interests as a junior faculty member. In March 1997, plaintiff also wrote and phoned the department chair, contesting the annual evaluation of her teaching. Plaintiff again stated that she was "alarmed" by the evaluation. Plaintiff also acknowledged at faculty meetings, her demeanor "was (is) a result of being insulted, degraded, put down, and yelled at for six years." In sum, plaintiff has not presented evidence that the Department consistently gave her glowing recommendations for tenure and promotion. However positive those evaluations might appear to a lay audience, plaintiff by her own admission has conceded that those individuals who were familiar with the tenure process understood otherwise. In addition, defendant has presented uncontested evidence that ratings on annual and pre-tenure reviews are inflated. *See* Dr. Stone–Ferrier letter to CCAPT dated October 29, 1997.

More importantly, an inference of discrimination does not arise from plaintiff's prior evaluations because she has not shown that male faculty members with similar ratings are generally awarded promotion and tenure. Indeed, defendant has presented evidence that it denied tenure to one of plaintiff's male colleagues who had similar annual evaluations. Absent evidence that favorable annual and pre-tenure reviews ordinarily result in promotion and tenure, an inference of discrimination based on plaintiff's prior reviews is not permissible.

### B. *Procedural Irregularities*

 Disturbing procedural irregularities, *e.g.*, falsifying or manipulating hiring criteria, may support an inference of discrimination. *See Simms v. State of Okla. ex rel. Dept. of Mental Health*, 165 F.3d 1321, 1328 (10th Cir.), *cert. denied*, —— U.S. ——, 120 S.Ct. 53, 145 L.Ed.2d 46 (1999); *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 532 (10th Cir.1994); *Mohammed v. Callaway*, 698 F.2d 395, 399 (10th Cir.1983). Plaintiff alleges several irregularities in the KFDAH handling of her tenure application.

First, plaintiff claims that the KFDAH did not follow the CCAPT sub-committee recommendation that it conduct a detailed annual review of her work. Plaintiff fails to show, however, that defendant treated any of her faculty colleagues differently or more favorably. Absent evidence that the KFDAH conducted such reviews for male faculty members or ordinarily followed the recommendations of the CCAPT sub-committee, no inference of pretext arises from its failure to follow the sub-committee recommendations in this instance. Moreover, although defendant did not precisely follow all of the CCAPT recommendations, it gave plaintiff annual reviews and noted potential problems with her teaching.

Plaintiff also claims that the KFDAH manipulated the "discipline expectations" to favor Dr. Cateforis. As noted, the discipline expectations were drafted in 1989 or 1990 for a prior candidate. On this record a jury would not reasonably find that the KFDAH "manipulated" the process in favor of Dr. Cateforis by using essentially the form it had used for nearly ten prior years. If anything, it appears that the KFDAH manipulated the process to Dr. Cateforis' *dis*advantage because it circulated a draft of the discipline expectations to all three candidates, allowing them to suggest revisions and incorporating at least two significant changes which plaintiff suggested. Plaintiff has not specified any significant suggestions which were omitted from the final version. Finally, the draft discipline expectations did not favor Dr. Cateforis because he was a man. Rather, as plaintiff concedes, they apparently favored him because he had worked on museum catalogues and exhibition brochures. This alleged "bias" is gender neutral and contrary to plaintiff's suggestion, it did not suddenly surface in 1997.

Finally, plaintiff alleges that contrary to university policy, the KFDAH selected former KU faculty members and former professors of Dr. Cateforis to serve as his external evaluators. The KU Guidelines for Promotion and Tenure Recommendations (1997–98) provide:

> External evaluators must not include dissertation advisors, former professors, graduate school colleagues, co-authors, KU Faculty, or one's own former students. Candidates whose special research requires drawing on such persons must make a special case to the appropriate department or school committee. Those reasons should be transmitted to the UCPT.

*Defendant's Reply Memorandum To Plaintiff Aquilino On Her Response To Defendant's Motion for Summary Judgment* (Doc. # 41) filed February 7, 2000, Exhibit 2 at xii. Plaintiff has not proven, however, that any external evaluator for Dr. Cateforis was a former professor. Although plaintiff has shown that one of his evaluators was a *former* KU faculty member, *see* Depo. of Max Keith Sutton at 53, she has not shown that KU generally excluded *former* faculty members from service as external evaluators. Indeed the record evidence suggests that on several occasions KU used former faculty members as external evaluators. *See* Depo. of Elizabeth Kuznesof at 47 ("this is not at all unprecedented. I think if you go through all of the cases, you'll find a number of cases that do include what you categorize as forbidden."); Depo. of Max Keith Sutton at 50–52 (prohibition applies only to current KU faculty, not former faculty); *see Memorandum In Support Of Motion For Summary Judgment On Claims Of Plaintiff* (Doc. # 24) filed December 15, 1999, Exhibit 2A at 18a (three of plaintiff's external evaluators were former visiting KU faculty members). On this record, while plaintiff may disagree whether the policy language prohibits use of former faculty members, she has not shown that the university agreed with her interpretation or that the KFDAH manipulated the selection process for external evaluators to favor Dr. Cateforis.[4]

4. The policy prohibits use of "former professors, graduate school colleagues, co-authors, KU Faculty, or one's own former students."

The alleged irregularities do not raise a reasonable inference that defendant believed anything except that plaintiff was unqualified for promotion and tenure. At most, plaintiff has shown that the review process was not perfect. "Title VII, however, does not afford plaintiff a flawless or fair tenure review process—it simply precludes the University from making an adverse tenure decision based, even in part, on plaintiff's [sex]." *Babbar v. Ebadi*, 36 F.Supp.2d 1269, 1279 (D.Kan.1998). Even if KU did not diligently follow its standard procedures in evaluating plaintiff's tenure application, such evidence does not permit an inference that plaintiff's sex was a motivating factor in defendant's tenure decision. *See Roberts v. State of Okla.*, 110 F.3d 74, 1997 WL 163524, at *7 (10th Cir.1997) (deviations from written university policies insufficient to establish pretext); *Randle*, 69 F.3d at 454 ("The mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent or that the substantive reasons given by the employer for its employment decision were pretextual."); *Rea*, 29 F.3d at 1459 (minor procedural deviation in defendant's layoff procedure did not amount to evidence of pretext).

### C. Defendant's Use Of Subjective Criteria

■ Plaintiff claims that defendant's use of subjective criteria, *i.e.* her research and scholarly work, suggests that its reason for not promoting her was a pretext for sex discrimination. Based on this reasoning, nearly every tenure decision could be challenged before a jury. Common sense does not support this position, nor do the authorities which are cited by plaintiff. The Tenth Circuit has noted that plaintiff is entitled to an inference of discrimination where "an otherwise qualified individual" is denied promotion based on subjective

considerations. *Pitre v. Western Elec. Co., Inc.*, 843 F.2d 1262, 1271–72 (10th Cir. 1988); *see Blong v. Secretary Of Army*, 877 F.Supp. 1494, 1500 (D.Kan.1995) (defendant rated plaintiff as "qualified" for position, but later decided not to hire anyone to fill position). Plaintiff has not shown, however, that KU determined that she met the *objective* qualifications for promotion and tenure. Further, the subjective considerations referred to in *Pitre* and the other authorities cited by plaintiff are quite different from considerations of research and scholarly work. *See Pitre*, 843 F.2d at 1271–72 ("ability, performance, potentiality, . . . and the needs of the business"); *Blong*, 877 F.Supp. at 1502–03 (seeking "best" person); *Berry v. General Motors Corp.*, 796 F.Supp. 1409, 1422 (D.Kan.1992) (general performance, people skills, and initiative). Finally, the inference of discrimination is most appropriate when the evaluators are not members of the protected group. *See Pitre*, 843 F.2d at 1272; *Blong*, 877 F.Supp. at 1503; *Berry*, 796 F.Supp. at 1422. Here, many of plaintiff's evaluators were women.

■ Plaintiff essentially claims that defendant did not properly apply the subjective criteria and exercised poor business judgment. An employer is not liable, however, simply because it relies on inaccurate or inconclusive information. The Court agrees with the rationale of other courts regarding the plaintiff's burden to show that a denial of tenure resulted from an unlawful reason:

> [C]ourts must be vigilant not to intrude into [tenure] determination[s], and should not substitute their judgment for that of the college with respect to the qualifications of faculty members for promotion and tenure. Determinations about such matters as teaching ability, research scholarship, and professional stature are subjective, and unless they

As plaintiff reads the policy, the term "former" modifies not just "professors," but "professors, graduate school colleagues, co-authors, KU Faculty, or one's own former stu-

dents." As to the latter, this construction would prohibit use of "former .... one's own former students." Plaintiff's argument in this regard is not persuasive.

can be shown to have been used as the mechanism to obscure discrimination, they must be left for evaluation by the professional, particularly since they often involve inquiry into aspects of arcane scholarship beyond the competence of individual judges [or jurors].

*Forsythe v. Board of Educ. of Unified Sch. Dist. No. 489*, 956 F.Supp. 927, 933 (D.Kan.1997) (quoting *Kunda v. Muhlenberg College*, 621 F.2d 532, 548 (3d Cir. 1980)); *Villanueva v. Wellesley College*, 930 F.2d 124, 129 (1st Cir.1991) ("It is not the function of the courts to sit as 'supertenure' committees."); *Zahorik*, 729 F.2d at 93 ("where the tenure file contains the conflicting views of specialized scholars, triers of fact cannot hope to master the academic field sufficiently to review the merits of such views and resolve the differences of scholarly opinion."). Although plaintiff has offered her own opinion as to her qualifications, as well as the positive opinions of several colleagues, such evidence is insufficient to show pretext. Plaintiff's colleagues on the KFDAH Promotion and Tenure Committee, the KFDAH chair, the CCAPT (by a seven to two vote), the College Dean, the UCPT (by unanimous vote) and the Provost all recommended against promotion and tenure.[5] Likewise the Chancellor, who had the ulti-mate authority to promote plaintiff, did not support her promotion and tenure. Against this evidence, plaintiff's assertion that she was qualified for promotion and tenure is insufficient to create a reasonable inference that the proffered reason for denial is pretextual. At most plaintiff has shown that KU may have misjudged her qualifications or relied on inaccurate information. Such an error, however, is insufficient to establish pretext. *See McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir.1998) ("An articulated motivating reason is not converted into pretext merely because, with the benefit of hindsight, it turned out to be poor business judgment."); *Furr v. Seagate Tech., Inc.*, 82 F.3d 980, 988 (10th Cir.1996) ("It is the manager's perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of [her] own relative performance.") (citations omitted), *cert. denied*, 519 U.S. 1056, 117 S.Ct. 684, 136 L.Ed.2d 608 (1997).

In short, the foregoing evidence would not permit a reasonable jury to conclude that defendant's proffered reason, *i.e.* deficiencies in plaintiff's teaching, research and service, is a pretext for sex discrimination.[6]

---

5. Plaintiff points out that Dr. Elizabeth Kuznesof, a colleague of plaintiff on the UCPT, testified that it was very difficult to reconcile the poor ratings plaintiff had received from her department with the fact that plaintiff was highly regarded elsewhere in the university. Dr. Kuznesof testified, however, that based on plaintiff's weak record of scholarly publications, she would not have recommended plaintiff for promotion and tenure even if the KFDAH gave plaintiff favorable evaluations in other areas.

6. The comments by Dr. Eglinski and Dr. Stone–Ferrier, discussed above, do not constitute sufficient circumstantial evidence that a discriminatory reason more likely motivated defendant or that the proffered reason is pretextual. In order for remarks to be sufficiently probative of discriminatory intent, plaintiff must demonstrate a nexus between the alleged discriminatory statements and defendant's adverse decision. *See Rea*, 29 F.3d at 1457; *see also Cone*, 14 F.3d at 531 (isolated comments, unrelated to challenged action, insufficient to show discriminatory animus). The comments have no demonstrated temporal proximity with the tenure decision. Dr. Eglinski made his statements approximately three and one-half years before the tenure decision and Dr. Stone–Ferrier made her statement approximately seven months before the tenure decision. Without such a nexus, the statements are best viewed as "stray remarks" that are not probative. *See id.* Moreover, ambiguous remarks regarding "style" and "manner" are too vague and abstract to support a claim for sex discrimination. *See Jalal v. Columbia Univ.*, 4 F.Supp.2d 224, 234 (S.D.N.Y.1998) ("If trial courts allow Title VII plaintiffs to reach a jury on the strength of comments by academic decisionmakers that are ambiguous, but support no rational inference of bias, th[e] principle [of freedom in the community of American universities] may be compromised.").

## II. Retaliation

■ Plaintiff alleges that after September 16, 1998, when she filed a sex discrimination charge, KU retaliated by refusing to hire her for the adjunct and ad hoc faculty positions in violation of Title VII. In analyzing plaintiff's retaliation claim the Court applies the familiar *McDonnell Douglas* shifting burden of proof, set forth above. In order to establish a prima facie case of retaliation under Title VII, plaintiff must show that (1) she engaged in protected opposition to Title VII discrimination; (2) she suffered an adverse employment action contemporaneous with or subsequent to such opposition or participation; and (3) a casual connection links the protected activity and the adverse employment action. *See Penry v. Federal Home Loan Bank of Topeka*, 155 F.3d 1257, 1263 (10th Cir.1998); *Thomas*, 111 F.3d at 1513. Plaintiff can establish the causal connection by "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Burrus*, 683 F.2d at 343.

Defendant concedes that plaintiff can establish a prima facie case of retaliation based on the filing of her administrative charge. After plaintiff establishes a prima facie case of retaliation, the burden shifts to KU to offer a legitimate reason for the adverse action. Here, KU claims that it did not hire plaintiff for the adjunct or ad hoc faculty positions because it had previously denied her promotion and tenure. *See Memorandum In Support Of Motion For Summary Judgment On Claims Of Plaintiff* (Doc. # 24) filed December 15, 1999 at 29.[7] The burden now shifts back to plaintiff to show a genuine dispute of material fact as to whether KU's proffered reason is pretextual. *See Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1394 (10th Cir.1997). Plaintiff may establish retaliation indirectly by demonstrating that KU's asserted reasons for the adverse actions at issue are unworthy of belief. *See id.* (citing *Murray v. City of Sapulpa*, 45 F.3d 1417, 1421 (10th Cir.1995)).

■ Plaintiff first claims that the close proximity between her protected activity and the adverse employment decisions is sufficient, by itself, to establish pretext. "Close proximity in time may provide some probative evidence of retaliatory intent." *Sanjuan v. IBP, Inc.*, 160 F.3d 1291, 1299 (10th Cir.1998). An inference of retaliation based on timing "can only be made, however, where 'close temporal proximity' exists between the bringing of charges and the subsequent adverse action." *Candelaria v. EG & G Energy Measurements, Inc.*, 33 F.3d 1259, 1262 (10th Cir.1994) (quoting *Smith v. Maschner*, 899 F.2d 940, 948–49 (10th Cir. 1990)). Here, the six to eleven month period between plaintiff's administrative charge and the adverse employment actions is insufficient, by itself, to support an inference of retaliation. *See Conner*, 121 F.3d at 1395 (four months insufficient to establish causal connection between protected activity and adverse actions); *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir.1997) (three months insufficient); *Candelaria*, 33 F.3d at 1262 (three years insufficient to establish retaliation).

■ In addition to the timing of the adverse employment actions, however, plaintiff has shown that KU's decision to deny tenure does not generally disqualify the faculty member from future non-tenured faculty positions with the university. *See Medina v. City of Osawatomie*, 992 F.Supp. 1269, 1272–73 (D.Kan.1998) (court will not consider issues first raised in reply briefs); *Mike v. Dymon, Inc.*, No. 95–2405–EEO, 1996 WL 427761, at *2 (D.Kan. July 25, 1996) ("In pursuit of fairness and proper notice, the court generally summarily denies or excludes all arguments and issues first raised in reply briefs.") (citations omitted).

7. In its reply brief, KU advances another reason for not hiring plaintiff for the ad hoc and adjunct positions: her appointment to these positions would not have served the university purposes of teaching courses or serving on a graduate committee. Defendant did not raise this argument in the original brief in support of its motion for summary judgment, and the Court therefore does not consider the issue.

Based on this evidence, a reasonable jury could find that defendant's offered reason for not hiring plaintiff for a non-tenured position, *i.e.* that she had previously been denied promotion and tenure, is unworthy of belief. The jury could further infer that defendant's true reason for not hiring plaintiff was the filing of her administrative charge in September 1998. Accordingly, the Court overrules defendant's motion for summary judgment on plaintiff's retaliation claim.

**IT IS THEREFORE ORDERED** that defendant's *Motion For Summary Judgment Against Plaintiff Aquilino* (Doc. # 23) filed December 15, 1999 be and hereby is **SUSTAINED** with respect to plaintiff's sex discrimination claim and is **OVERRULED** with respect to plaintiff's retaliation claim.