FILED
United States Court of Appeals
Tenth Circuit

February 23, 2009

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

TENATH CIRCUIT

---

JACQUELINE E. LEE,

        Plaintiff - Appellant,

v.

UNIVERSITY OF COLORADO,
through its Board, The Regents of the
University of Colorado, a body
corporate,

        Defendant - Appellee.

No. 08-1029

(D. Colo.)

(D.C. No. 1:06-CV-02417-EWN-BNB)

---

ORDER AND JUDGMENT[*]

---

Before **KELLY**, **LUCERO**, and **MURPHY**, Circuit Judges.

---

I.    INTRODUCTION

Plaintiff Jacqueline E. Lee brought suit against Defendant the University of

Colorado in the United States District Court for the District of Colorado alleging

she was denied tenure on account of her race and sex in violation of Title VII of

the Civil Rights Act, 42 U.S.C. §§ 2000e to 2000e-17, and Title IX of the

---

[*]This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

Education Amendments of 1972, 20 U.S.C. §§ 1681 to 1688. Applying the *McDonnell Douglas* framework, the district court concluded Dr. Lee had established a prima facie case of discrimination. As its legitimate non-discriminatory reason for denying Dr. Lee tenure, the University of Colorado stated Dr. Lee's dossier failed to show excellence in research. Dr. Lee argued an inference of pretext for unlawful discrimination could be drawn from, *inter alia*, (1) a comparison of her research to that of a colleague who was granted tenure, and (2) the final decision-maker's use of unauthorized criteria in making the tenure decision. The district court concluded Dr. Lee failed to demonstrate a genuine issue of material fact as to whether the proffered reason for denying her tenure was pretext for discrimination and granted summary judgment in favor of the University of Colorado. Dr. Lee filed a timely appeal. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we **affirm** the decision of the district court.

## II. BACKGROUND

### A. Tenure Standards at the University of Colorado

The Board of Regents of the University of Colorado governs a system of university campuses, including the University of Colorado at Boulder ("UCB") campus. The Laws of the Regents provide: "Tenure may be awarded only to faculty members with demonstrated meritorious performance in each of the three areas of teaching, research or creative work, and service, and demonstrated excellence in either teaching, or research or creative work." The Department of

Molecular, Cellular, and Developmental Biology ("MCDB") at UCB is a "primary unit." Each primary unit develops written criteria for measuring the performance of its tenure candidates. These criteria "shall be included in the candidate's dossier" and "shall be used by every level of review." Under the Laws of the Regents:

> [e]very candidate for . . . tenure shall consult with and be advised by the chair of the primary unit regarding the areas of performance that will be examined, other factors that have a material bearing on the decision, the standards of performance that must be met, and the primary unit criteria that the primary unit uses in reaching a decision about the candidate's performance.

B.      Dr. Lee's Tenure Review Process

In January 1997, Dr. Lee, an Asian-American female, began working as a tenure-track assistant professor in MCDB. Tenure-track assistant professors generally undergo one pre-tenure review for reappointment during their probationary period,[1] typically after their third year of service. In September 1999, Dr. Lee underwent her pre-tenure review. The review reflected Dr. Lee had excellent research funding, an excellent record of publication, and an excellent reputation in the scientific community. Dr. Philip DiStefano, who was then UCB's Vice-Chancellor for Academic Affairs, gave Dr. Lee a positive review. He expressed no criticism of Dr. Lee's extramural funding situation.[2] Dr. Lee

_____

[1]The probationary period is normally seven years.

[2]Extramural funding constitutes grants received by Dr. Lee from an entity
(continued...)

was to be reviewed for tenure during the 2003–2004 academic year, but this review was not completed due to procedural concerns.  Thus, Dr. Lee was reviewed for tenure during the 2004–2005 academic year, and this review resulted in a final determination.

The Laws of the Regents state "[e]very candidate for tenure or promotion shall be reviewed by the primary unit (advised by its evaluation committee), the dean (advised by a college or school-level review committee), and the chief academic officer (advised by a campus-level advisory committee)."  MCDB's Primary Unit Evaluation Committee ("PUEC") first votes on a tenure decision, and then forwards its recommendation to the department's tenured faculty, where a two-thirds favorable vote is required to receive a departmental recommendation for tenure.  The department then forwards its recommendation for college-level review.  In November 2004, MCDB's PUEC voted, two-to-one, to recommend Dr. Lee for tenure.  It then forwarded its recommendation to the department's tenured faculty, which voted, ten-to-eight, against tenure.

From the department, the Personnel Committee of the College of Arts and Sciences takes up review, advising the Dean of the College of Arts and Sciences. If the Personnel Committee does not concur with the department recommendation, it may return the case for reconsideration.  The Dean then recommends for or

<hr>

[2](...continued)
other than UCB.

against tenure. In February 2005, the Personnel Committee voted, six-to-six, not to concur with MCDB's recommendation and returned Dr. Lee's case to the department for reconsideration. In March 2005, MCDB reconsidered the case. It voted eleven-to-six against tenure, and returned the case to the Personnel Committee. Thereafter, the Personnel Committee concurred, seven-to-four, with MCDB's recommendation to deny tenure. After reviewing Dr. Lee's dossier and the previous recommendations, Dean Todd Gleeson recommended tenure be denied.

The Vice Chancellor's Advisory Committee ("VCAC") proceeds with the next level of review, advising the Provost. If VCAC does not agree with the Dean's decision, it may return the case for reconsideration. The Provost then recommends for or against tenure. In May 2005, VCAC unanimously recommended Dr. Lee receive tenure and returned Dr. Lee's dossier to Dean Gleeson for reconsideration. Upon reconsideration, Dean Gleeson again voted against tenure and returned the case to VCAC. VCAC again unanimously recommended tenure and forwarded the recommendation to Interim Provost Susan Avery, who accepted VCAC's recommendation.

The final tenure determination, subject to limited review by the President of the University and the Board of Regents, rests with the Chancellor. At the time of Dr. Lee's tenure review, Dr. DiStefano was Chancellor. By the time Dr. DiStefano reviewed Dr. Lee's dossier and the recommendations from below,

approximately fifty faculty members and administrators had reviewed the case. Dr. DiStefano contends he did not compare Dr. Lee to any other past tenure candidate because he believes every candidate should be evaluated on her "unique indicia of performance."

Those who previously reviewed Dr. Lee's candidacy agreed she had not demonstrated excellence in teaching, but disagreed as to whether she had shown excellence in research. Thus, Dr. DiStefano's review focused on whether Dr. Lee had demonstrated excellence in research. Under MCDB's primary unit criteria, a tenure candidate's research is to be evaluated for: (1) publication of "originality and importance," especially in "peer-reviewed journals or in prestigious symposium volumes"; (2) extramural grants, which although not required in specific amounts, should be sufficient to support "an active research program"; (3) the candidate's national and international reputation, as evinced by letters from reviewers outside of UCB; and (4) other evidence of achievement in research.

Dr. Lee's tenure dossier contained thirteen external letters of review. Only twelve letters were in evidence. Of the twelve letters, ten explicitly recommend tenure. A number of the evaluations state Dr. Lee's: (1) publication record was of modest quantity but of high quality, appearing in prestigious journals; and (2) research focus was complex and time-consuming. During her probationary period (from January 1997 to the tenure decision in June 2005), Dr. Lee was invited to

give lectures at five major international scientific conferences and three smaller gatherings. In addition, Dr. Lee received about $2,150,000 in extramural grants. The $2,150,000 figure includes approximately $800,000 from three grants awarded to Dr. Lee prior to her employment at UCB, but which funded Dr. Lee's initial work at UCB. The $2,150,000 figure also includes about $700,000 in funds not awarded to Dr. Lee as Principal Investigator. This means another researcher was actually awarded the grant, and then a portion of the grant money was given to Dr. Lee as a researcher on a subproject.

In Dr. DiStefano's estimation, Dr. Lee's record of published works demonstrated a modest volume of well-received articles since joining MCDB, but her publication record did not establish excellence in research. With regard to extramural funding, Dr. DiStefano claims that, in evaluating a candidate's grants, he considers whether the candidate was the Principal Investigator on the grant and whether the candidate received the grant after joining the UCB faculty. He believes receiving a grant as Principal Investigator is important because it shows recognition by experts in the candidate's field of the importance of her work. In addition, the funds received by a candidate as Principal Investigator after joining the UCB faculty provide an indicator of whether the candidate possesses the independent ability to fund her laboratory. Dr. Lee claims that at no time prior to her tenure review was she advised by the MCDB Chair or by any other tenured MCDB member that being designated the Principal Investigator on a grant was of

any significance. The University of Colorado concedes the Chair had no specific practice "of telling any tenure candidate that it was important to be awarded grants as opposed to being the recipients of funds from grants awarded to others." In Dr. DiStefano's estimation, the two new research grants Dr. Lee received as Principal Investigator since joining the UCB faculty — one for $445,000 and another for $165,000 — were insufficient to demonstrate excellence in research.

Dr. DiStefano also considered the external letters of review UCB had obtained from professors working in Dr. Lee's discipline at other institutions. Dr. DiStefano found Dr. Lee's letters to be complimentary, but lacking in indicators of excellence in research in light of her publication record and history of funding. Dr. DiStefano denied Dr. Lee tenure in June 2005. Thereafter, Dr. Lee appealed Dr. DiStefano's decision through various routes within UCB, but did not obtain relief. Dr. Lee requested a meeting with Dr. DiStefano soon after he denied her tenure. Dr. DiStefano notified Dr. Lee that he would not meet with her. The same day, Dr. Lee again asked for a meeting, emphasizing her entitlement under the University of Colorado Faculty Handbook for a confidential conversation about "the reasons which contributed to a recommendation" against tenure. Dr. Lee asserts Dr. DiStefano refused to advise her of any specific reason which contributed to his rejection of her tenure candidacy.

C.    Dr. Jones

MCDB accepted Dr. Kevin Jones as a tenure-track assistant professor in

1994. Dr. Lee alleges she and Dr. Jones have similar research programs involving the manipulation of the genes of mice. Dr. Lee and Dr. Jones are about the same age, completed their doctoral training around the same time, and were accepted as tenure-track associate professors at about the same time. Dr. Jones's pre-tenure review process, which took place in 1998, was "difficult" due, at least in part, to his "spartan" progress in his research program. The pre-tenure review was ultimately favorable, however, noting Dr. Jones's work was at a similar stage to that of Dr. Lee and two other researchers. During his probationary period, Dr. Jones published the same number of articles as Dr. Lee, but his articles generally appeared in less prestigious journals. Additionally, Dr. Jones's articles were cited much less frequently than were those of Dr. Lee.

During his probationary period, Dr. Jones received six grants totaling $1,172,641. During the same time period, Dr. Jones was invited to speak at nine seminars. There were eleven external letters in Dr. Jones's dossier, but Dr. Lee only submitted ten to the court. At least five of the letters explicitly supported Dr. Jones's promotion. Generally, the letters were critical of the slow start Dr. Jones had at UCB with regard to research and publishing, but they also noted his productivity was on a sharp upswing.

Dr. Jones was considered for tenure in 2001 and 2002. Dr. DiStefano, who was then UCB's Provost, recommended Dr. Jones be granted tenure. Dr. Jones was granted tenure effective August 19, 2002, after a review by essentially the

same groups and committees as in Dr. Lee's tenure case. The same policies effective during Dr. Lee's review were effective during Dr. Jones's review.

D.     District Court Proceedings

Dr. Lee brought suit against the University of Colorado in the United States District Court for the District of Colorado alleging she had been denied tenure based on her race and sex in violation of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e-2000e-17, and Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688. The district court concluded Dr. Lee had presented a prima facie case of discrimination because she: (1) belonged to a protected class, (2) was qualified for tenure, (3) sought but did not receive tenure, and (4) the position was filled with a non-protected person or remained available following the decision not to promote her. As its legitimate non-discriminatory reason for denying Dr. Lee tenure, the University of Colorado cited Dr. DiStefano's determination that, given Dr. Lee's funding, publications, and external letters, Dr. Lee's dossier failed to show excellence in research. Dr. Lee argued an inference of pretext for unlawful discrimination could be drawn from, *inter alia*, a comparison of her research to that of Dr. Jones and Dr. DiStefano's use of unauthorized criteria in making the tenure decision. The district court concluded Dr. Lee failed to demonstrate a genuine issue of material fact as to the existence of pretext and granted summary judgment in favor of the University of Colorado.

Dr. Lee appeals the district court's conclusion that she failed to demonstrate a genuine issue of material fact as to pretext. On appeal she argues pretext can be inferred from Dr. Distefano's use of unauthorized criteria in making the tenure decision and a comparison of her record to Dr. Jones's record.

## III. DISCUSSION

"We review de novo a district court's grant of summary judgment, viewing the evidence in the light most favorable to the nonprevailing party." *Mullin v. Travelers Indem. Co. of Conn.*, 541 F.3d 1219, 1222 (10th Cir. 2008). "Summary judgment is appropriate if there is no genuine dispute over any material fact, and a party is entitled to prevail as a matter of law." *Id.* (quotation omitted). Title VII prohibits employment discrimination based on race and sex. 42 U.S.C. § 2000e-2(a)(1). Title IX prohibits sex discrimination "under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "Courts have generally assessed Title IX discrimination claims under the same legal analysis as Title VII claims." *Gossett v. Okla. ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1176 (10th Cir. 2001).

Where, as here, the plaintiff does not have direct evidence of discrimination, the case proceeds under the *McDonnell Douglas* burden-shifting analysis. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). Under the *McDonnell Douglas* framework, the plaintiff has the burden of establishing a prima facie case of discrimination. *Sanchez v. Denver Pub. Sch.*,

164 F.3d 527, 531 (10th Cir. 1998).  Once a plaintiff establishes a prima facie case of discrimination, the burden of production shifts to the defendant to articulate some legitimate nondiscriminatory reason for its decision.  *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1226 (10th Cir. 2000).  If the defendant is able to articulate a legitimate nondiscriminatory reason for its decision, the burden then shifts back to the plaintiff to demonstrate the defendant's proffered justification is pretextual.  *Id.*

The parties do not dispute that Dr. Lee presented a prima facie case of discrimination or that the University of Colorado offered a legitimate non-discriminatory reason for denying her tenure.  Thus, the only element of the *McDonnell Douglas* framework at issue here is the existence of pretext.  This court must therefore determine whether Dr. Lee created a genuine issue of material fact as to whether the University of Colorado's proffered reason for denying her tenure, that her dossier failed to show excellence in research, was pretext for discrimination.  *See Riggs v. Airtran Airways, Inc.*, 497 F.3d 1108, 1116 (10th Cir. 2007).  "When assessing whether [a] plaintiff has made an appropriate showing of pretext, [the court] must consider the evidence as a whole."  *Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1250 (10th Cir. 2002).

A.      Unauthorized Standards

Pretext may be shown "by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered

-12-

legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* (quotation omitted). Under MCDB's primary unit criteria for determining whether a candidate has demonstrated excellence in research, one of the factors to be considered is the candidate's extramural support. The MCDB policies state extramural support "should be available in sufficient quantity to support an active research program." Dr. Lee contends Dr. DiStefano added criteria to the extramural funding analysis by counting only grants awarded to her after her arrival at UCB, even though the funding she received before her arrival at UCB supported her UCB research, and discounting funding she obtained in capacities other than as Principal Investigator. In addition, Dr. Lee contends that because the University is firm in its policy that primary unit criteria be used at all levels of review, if the unauthorized criteria existed they would have been applied by Dr. DiStefano during her pre-tenure review. Yet, the pre-tenure review did not mention any issues with extramural funding. Dr. Lee also points out she was not explicitly told of the unauthorized criteria, even though the Laws of the Regents mandate that the department chair advise every candidate of "the primary unit criteria that the primary unit uses in reaching a decision about the candidate's performance." Thus, Dr. Lee argues, the evidence in the record supports a reasonable inference

that the criteria cited by Dr. DiStefano for his decision did not exist and are

therefore pretextual.

An employer's use of non-existent criteria in evaluating an employee may

support a showing of pretext. *Simms v. Okla. ex rel. Dept. of Mental Health and*

*Substance Abuse Servs.*, 165 F.3d 1321, 1328 (10th Cir. 1999) (stating procedural

irregularities such as falsifying or manipulating hiring criteria may serve as

evidence of pretext); *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1040 (7th Cir.

1993) ("When the existence of a uniform policy or practice is in doubt, it cannot

serve as a reason for [the employment action in question].").  Dr. Lee, however,

has failed to present a genuine issue of material fact as to whether the criteria

used to evaluate her were non-existent.  Evidence that (1) Dr. Lee was not told of

the criteria in question as required by the Laws of the Regents, (2) the MCDB

policies did not explicitly mention the criteria, and (3) Dr. Lee's pre-tenure

review did not mention the criteria, does not alone create a genuine issue of

material fact as to whether these criteria for evaluating tenure candidates existed.

*See Randle v. City of Aurora*, 69 F.3d 441, 454 (10th Cir. 1995) ("The mere fact

that an employer failed to follow its own internal *procedures* does not necessarily

suggest that the employer was motivated by illegal discriminatory intent or that

the substantive reasons given by the employer for its employment decision were

pretextual."); *Aquilino v. Univ. of Kan.*, 83 F. Supp. 2d 1248, 1258 (D. Kan.

2000) ("Even if KU did not diligently follow its standard procedures in evaluating

plaintiff's tenure application, such evidence does not permit an inference that plaintiff's sex was a motivating factor in defendant's tenure decision."). If the criteria were applied uniformly to all tenure candidates, with no candidate being explicitly informed of their existence, then there exists no reasonable inference of pretext from the evidence cited by Dr. Lee. *See id.* at 1257-58 (concluding no reasonable inference of pretext existed where plaintiff failed to show the policy in question was not applied to other tenure candidates). Dr. DiStefano claims he followed his normal practices in evaluating Dr. Lee's case, and Dr. Lee has offered no evidence to rebut this assertion. On the contrary, she expressly declines to allege the criteria applied only to her and were not applied to previous candidates. Thus, the facts cited by Dr. Lee regarding the use of allegedly non-existent criteria do not create a reasonable inference of pretext, and there is no genuine issue of material fact as to whether these criteria existed prior to Dr. Lee's tenure review.

B.     Comparison to Dr. Jones

In determining whether an employer's proffered reason for an employment decision is pretextual, "we consider the facts as they appeared to the person making the decision, and we do not second-guess the employer's decision even if it seems in hindsight that the action taken constituted poor business judgment." *Riggs*, 497 F.3d at 1119. "The reason for this rule is plain: our role is to prevent intentional discriminatory hiring practices, not to act as a 'super personnel

-15-

department,' second guessing employers' honestly held (even if erroneous) business judgments." *Young v. Dillon Cos.*, 468 F.3d 1243, 1250 (10th Cir. 2006). Thus, when comparing candidates for the same position, this court is willing to infer pretext only when "the facts assure . . . that the plaintiff is better qualified than the other candidates for the position." *Jones v. Barnhart*, 349 F.3d 1260, 1267 (10th Cir. 2003).

As the district court noted, Dr. Lee proffered evidence indicating her publications and external letters of review were generally stronger than those of Dr. Jones. As discussed above, however, these were not the only criteria considered in evaluating tenure candidates. It is undisputed that under MCBD policies, extramural funding is another major criterion on which tenure candidates are evaluated. Dr. DiStefano gave unrebutted testimony that he considers extramural funding, with a particular emphasis on funding received as a Principal Investigator after the candidate's arrival at UCB, in his tenure evaluations. Here, Dr. Lee received approximately $600,000 from new grants as Principal Investigator during her nine-year probationary period, while Dr. Jones received $1,172,641 from new grants as Principal Investigator during his eight-year probationary period.[3] Consequently, this court cannot say the facts assure Dr. Lee

_____

[3]Dr. Lee contends there is no indication in Dr. Jones's dossier as to whether he was the Principal Investigator on his grants. Defendants, however, presented the undisputed testimony of Dr. Distefano that he was aware Dr. Jones was the Principal Investigator on his grants because when, as in the case of Dr. Jones, a

(continued...)

was better qualified than Dr. Jones to receive tenure.  *Id.* at 1268 (stating no inference of pretext existed where other candidates had "rational basis advantages" over the plaintiff).

## IV.    CONCLUSION

For the reasons discussed above, Dr. Lee has failed to demonstrate a genuine issue of material fact on the issue of pretext.  Thus, we **affirm** the district court's grant of summary judgment to the University of Colorado.[4]

ENTERED FOR THE COURT


Michael R. Murphy
Circuit Judge

---

[3](...continued)
grant listed on a curriculum vitae does not state the name of the Principal Investigator, it is understood the Principal Investigator is the author of the curriculum vitae.

[4]We need not address the University of Colorado's contention that certain material facts were admitted by Dr. Lee when she failed to respond in the proper form to the facts set forth in the University of Colorado's motion for summary judgment, since, even assuming these facts were not admitted, as we have done here, Dr. Lee cannot prevail.